GENERAL ELECTRIC CO. *v.* GILBERT ET AL.

No. 74–1589. Argued January 19–20, 1976—Reargued October 13, 1976—Decided December 7, 1976*

---

*Together with No. 74–1590, *Gilbert et al.* v. *General Electric Co.*, also on certiorari to the same court. See *post*, at 127 n. 1.

*Theophil C. Kammholz* reargued the cause for petitioner.[†] With him on the briefs were *Stanley R. Strauss, John S. Battle, Jr.,* and *J. Robert Brame III.*

*Ruth Weyand* reargued the cause for respondents.[†] With her on the briefs were *Winn Newman* and *Seymour DuBow.*

*Assistant Attorney General Pottinger* argued the cause for the United States et al. on reargument as *amici curiae* urging affirmance. With him on the brief were *Solicitor General Bork, Brian K. Landsberg, Walter W. Barnett, Abner W. Sibal, Joseph T. Eddins, Beatrice Rosenberg,* and *Linda Colvard Dorian.*[‡]

---

[†]See *post,* at 127 n. 1.

[‡]Briefs of *amici curiae* urging reversal were filed by *Gordon Dean Booth, Jr.,* for Alaska Airlines, Inc., et al.; by *Edward Silver,*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner, General Electric Co.,[1] provides for all of its employees a disability plan which pays weekly non-occupational sickness and accident benefits. Excluded from the plan's coverage, however, are disabilities arising from pregnancy. Respondents, on behalf of a class of women employees, brought this action seeking, *inter alia*,[2] a declara-

---

Larry M. Lavinsky, Stephen E. Tisman, Sara S. Portnoy, and Manuel M. Gorman for American Life Insurance Assn. et al.; by Joseph T. King for the American Society for Personnel Administration; by Thompson Powers for the American Telephone & Telegraph Co.; by Thornton H. Brooks for Celanese Corp.; by Gerard C. Smetana, Jerry Kronenberg, Julian D. Schreiber, Lawrence B. Kraus, and Richard B. Berman for the Chamber of Commerce of the United States; by Kalvin M. Grove, Lawrence M. Cohen, Jeffrey S. Goldman, Robert A. Penney, and Clem R. Kyle for Liberty Mutual Insurance Co.; by Richard D. Godown for the National Association of Manufacturers of the United States; by Lloyd Sutter for Owens-Illinois, Inc., et al.; and by John G. Wayman, Scott F. Zimmerman, and Walter P. DeForest for Westinghouse Electric Corp.

Briefs of *amici curiae* urging affirmance were filed by William J. Brown, Attorney General, and Earl M. Manz, Assistant Attorney General, for the State of Ohio; by J. Albert Woll, Laurence Gold, Stephen I. Schlossberg, and John Fillion for the American Federation of Labor and Congress of Industrial Organizations et al.; and by Mary K. O'Melveny, Jonathan W. Lubell, H. Howard Ostrin, and Charles V. Koons for Communications Workers of America, AFL–CIO.

Briefs of *amici curiae* were filed by Robert G. McClintock for the School District of the City of Ladue, and by Thomas I. Emerson, Ruth Bader Ginsberg, and Melvin L. Wulf for Women's Law Project et al.

[1] All the parties to the suit joined in petitioning for a writ of certiorari. General Electric was the moving party before the Court of Appeals, where the judgment of the District Court was affirmed. The parties have agreed that General Electric is to be deemed the petitioner for purposes of briefing and oral argument, a convention we adopt for the writing of this opinion.

[2] Respondents also represent a class of women employees who have been denied such benefits since September 14, 1971, and seek damages arising from this denial.

tion that this exclusion constitutes sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* The District Court for the Eastern District of Virginia, following a trial on the merits, held that the exclusion of such pregnancy-related disability benefits from General Electric's employee disability plan violated Title VII, 375 F. Supp. 367. The Court of Appeals affirmed, 519 F. 2d 661, and we granted certiorari, 423 U. S. 822. We now reverse.

I

As part of its total compensation package, General Electric provides nonoccupational sickness and accident benefits to all employees under its Weekly Sickness and Accident Insurance Plan (Plan) in an amount equal to 60% of an employee's normal straight-time weekly earnings. These payments are paid to employees who become totally disabled as a result of a nonoccupational sickness or accident. Benefit payments normally start with the eighth day of an employee's total disability (although if an employee is earlier confined to a hospital as a bed patient, benefit payments will start immediately), and continue up to a maximum of 26 weeks for any one continuous period of disability or successive periods of disability due to the same or related causes.[3]

The individual named respondents are present or former hourly paid production employees at General Electric's plant in Salem, Va. Each of these employees was pregnant during

---

[3] With respect to the Plan, General Electric is, in effect, a self-insurer. While General Electric has obtained, for employees outside California, an insurance policy from the Metropolitan Life Insurance Co., this policy involves the payment of a tentative premium only, subject to adjustment in the light of actual experience. Pretrial Stipulation of Facts, ¶ 11, App. 175–176. In effect, therefore, the Metropolitan Life Insurance Co. is used to provide the administrative service of processing claims, while General Electric remains, for all practical purposes, a self-insurer.

1971 or 1972, while employed by General Electric, and each presented a claim to the company for disability benefits under the Plan to cover the period while absent from work as a result of the pregnancy. These claims were routinely denied on the ground that the Plan did not provide disability-benefit payments for any absence due to pregnancy.[4] Each of the respondents thereafter filed charges with the Equal Employment Opportunity Commission (EEOC) alleging that the refusal of General Electric to pay disability benefits under the Plan for time lost due to pregnancy and childbirth discriminated against her because of sex. Upon waiting the requisite number of days, the instant action was commenced in the District Court.[5] The complaint asserted a violation of Title VII. Damages were sought as well as an injunction directing General Electric to include pregnancy disabilities within the Plan on the same terms and conditions as other nonoccupational disabilities.

---

[4] Additionally, benefit payment coverage under the Plan for all disabilities, whether or not related to pregnancy, terminates "on the date you cease active work because of total disability or pregnancy, except that if you are entitled to Weekly Benefits for a disability existing on such date of cessation" benefit payments will be continued in accordance with the provisions of the Plan. In cases of personal leave, layoff, or strike, however, the coverage for future nonoccupational sickness or accident disability is continued for 31 days, *ibid.*

In the case of respondent Emma Furch, who took a pregnancy leave on April 7, 1972, and who was hospitalized with a non-pregnancy-related pulmonary embolism on April 21, 1972, a claim was filed for disability benefits under the Plan solely for the period of absence due to the pulmonary embolism. The claim was rejected "since such benefits have been discontinued in accordance with the provisions of the General Electric Insurance Plan."

[5] Plaintiffs in the action were seven female employees; the International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC (IUE); and the latter's affiliate, Local 161, which is a joint collective-bargaining representative, with the IUE, of the hourly paid production and maintenance employees at General Electric's Salem, Va., plant.

Following trial, the District Court made findings of fact and conclusions of law, and entered an order in which it determined that General Electric, by excluding pregnancy disabilities from the coverage of the Plan, had engaged in sex discrimination in violation of § 703 (a)(1) of Title VII, 42 U. S. C. § 2000e–2 (a)(1). The District Court found that normal pregnancy, while not necessarily either a "disease" or an "accident," was disabling for a period of six to eight weeks; [6] that approximately "[t]en per cent of pregnancies are terminated by miscarriage, which is disabling"; [7] and that approximately 10% of pregnancies are complicated by diseases which may lead to additional disability. [8] The District Court noted the evidence introduced during the trial, a good deal of it stipulated, concerning the relative cost to General Electric of providing benefits under the Plan to male and female employees, [9] all of which indicated that, with pregnancy-related disabilities excluded, the cost of the Plan to General Electric per female employee was at least as high as, if not substantially higher than, the cost per male employee. [10]

---

[6] The District Court made the following "specific findings":

"1. While pregnancy is perhaps most often voluntary, a substantial incidence of negligent or accidental conception also occurs.

"2. Pregnancy, *per se*, is not a disease.

"3. A pregnancy without complications is normally disabling for a period of six to eight weeks, which time includes the period from labor and delivery, or slightly before, through several weeks of recuperation." 375 F. Supp. 367, 377.

[7] *Ibid.*

[8] "Five percent of pregnancies are complicated by diseases which are found in nonpregnant persons but which may have been stimulated by pregnancy. Five percent of pregnancies are complicated by pregnancy-related diseases. These complications are diseases which may lead to disability." *Ibid.*

[9] The District Court included in its opinion the following charts from a stipulation dated July 24, 1973:

"143. During 1970, GE's experience, by sex, with respect to claims under

The District Court found that the inclusion of pregnancy-related disabilities within the scope of the Plan would "increase G. E.'s [disability benefits plan] costs by an amount which, though large, is at this time undeterminable." 375 F. Supp., at 378. The District Court declined to find that the present actuarial value of the coverage was equal as between men and women,[11] but went on to decide that even

---

its weekly sickness and accident disability insurance coverage was as follows:

|  | Male | Female |
|---|---|---|
| No. of claims (new) | 19,045 | 15,509 |
| Average duration of claim | 48 days | 52 days |
| No. of new claims per thousand employees | 77 | 173 |
| Average No. of employees covered | 246,492 | 89,705 |
| Total benefits paid | $11,279,110 | $7,405,790 |
| Average cost per insured employee of total benefits paid | $45.76 | $82.57 |

"144. During 1971, GE's experience, by sex, with respect to claims under its weekly sickness and accident disability insurance coverage was as follows:

|  | Male | Female |
|---|---|---|
| No. of claims (new) | 22,987 | 17,719 |
| Average duration of claim | 47 days | 52 days |
| No. of new claims per thousand employees | 99 | 217 |
| Average No. of employees covered | 231,026 | 81,469 |
| Total benefits paid | $14,343,000 | $9,191,195 |
| Average cost per insured employee of total benefits paid | $62.08 | $112.91" |

*Ibid.*

[10] At trial, General Electric introduced, in addition to the material cited in n. 9, *supra,* the testimony of Paul Jackson, an actuary, who calculated that the Plan presently "costs 170% more for females than males . . . ." *Id.,* at 378.

[11] "The present plan is objectionable in that it excludes from coverage a unique disability which affects only members of the female sex, while no suggestion is made to exclude disabilities which can be said to affect only males. Additionally, the Court gives no weight to the suggestion that the actuarial value of the coverage now provided is equalized as

had it found economic equivalence, such a finding would not in any case have justified the exclusion of pregnancy-related disabilities from an otherwise comprehensive nonoccupational sickness and accident disability plan. Regardless of whether the cost of including such benefits might make the Plan more costly for women than for men, the District Court determined that "[i]f Title VII intends to sexually equalize employment opportunity, there must be this one exception to the cost differential defense." *Id.*, at 383.

The ultimate conclusion of the District Court was that petitioner had discriminated on the basis of sex in the operation of its disability program in violation of Title VII, *id.*, at 385–386. An order was entered enjoining petitioner from continuing to exclude pregnancy-related disabilities from the coverage of the Plan, and providing for the future award of monetary relief to individual members of the class affected. Petitioner appealed to the Court of Appeals for the Fourth Circuit, and that court by a divided vote affirmed the judgment of the District Court.

Between the date on which the District Court's judgment was rendered and the time this case was decided by the Court of Appeals, we decided *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), where we rejected a claim that a very similar disability program established under California law violated the Equal Protection Clause of the Fourteenth Amendment because that plan's exclusion of pregnancy disabilities represented sex discrimination. The majority of the Court of Appeals felt that *Geduldig* was not controlling because it

---

between men and women. Defenses must be bottomed on evidence, and such, in this regard, is lacking here.

"Whatever inferences may be suggested by the statistical data presented, the Court simply cannot presume to draw any precise conclusions as to the actuarial value of the coverage provided under the present plan, or the effect of including pregnancy related disabilities on the basis of that limited data." *Id.*, at 382–383.

arose under the Equal Protection Clause of the Fourteenth Amendment, and not under Title VII, 519 F. 2d, at 666–667. The dissenting opinion disagreed with the majority as to the impact of *Geduldig,* 519 F. 2d, at 668–669. We granted certiorari to consider this important issue in the construction of Title VII.[12]

## II

Section 703 (a)(1) provides in relevant part that it shall be an unlawful employment practice for an employer

> "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U. S. C. § 2000e–2 (a)(1).

While there is no necessary inference that Congress, in choosing this language, intended to incorporate into Title VII the concepts of discrimination which have evolved from court decisions construing the Equal Protection Clause of the Fourteenth Amendment, the similarities between the congressional language and some of those decisions surely indicate that the latter are a useful starting point in interpreting the former. Particularly in the case of defining the term "discrimination," which Congress has nowhere in Title VII defined, those cases afford an existing body of law analyzing and discussing that term in a legal context not wholly dissimilar to the concerns which Congress manifested in enacting Title VII. We think, therefore, that our decision in *Geduldig* v. *Aiello, supra,* dealing with a strikingly similar disability plan, is quite relevant in determining whether or not the pregnancy exclusion did discriminate on the basis of sex. In *Geduldig,* the disability insurance system was

---

[12] As noted, *supra,* at 127 n. 1, this is a joint petition. Respondents have presented several additional questions, not all of which merit treatment in this opinion. We have concluded that they are all without merit.

funded entirely from contributions deducted from the wages of participating employees, at a rate of 1% of the employee's salary up to an annual maximum of $85. In other relevant respects, the operation of the program was similar to General Electric's disability benefits plan, see 417 U. S., at 487–489.

We rejected appellee's equal protection challenge to this statutory scheme. We first noted:

> "We cannot agree that the exclusion of this disability from coverage amounts to invidious discrimination under the Equal Protection Clause. California does not discriminate with respect to the persons or groups which are eligible for disability insurance protection under the program. The classification challenged in this case relates to the asserted underinclusiveness of the set of risks that the State has selected to insure." *Id.*, at 494.

This point was emphasized again, when later in the opinion we noted:

> "[T]his case is thus a far cry from cases like *Reed* v. *Reed*, 404 U. S. 71 (1971), and *Frontiero* v. *Richardson*, 411 U. S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed, supra,* and *Frontiero, supra.* Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reason-

able basis, just as with respect to any other physical condition.

"The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes." *Id.,* at 496–497, n. 20.

The quoted language from *Geduldig* leaves no doubt that our reason for rejecting appellee's equal protection claim in that case was that the exclusion of pregnancy from coverage under California's disability-benefits plan was not in itself discrimination based on sex.

We recognized in *Geduldig,* of course, that the fact that there was no sex-based discrimination as such was not the end of the analysis, should it be shown "that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other," *ibid.* But we noted that no semblance of such a showing had been made:

"There is no evidence in the record that the selection of the risks insured by the program worked to discriminate against any definable group or class in terms of the aggregate risk protection derived by that group or class from the program. There is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.,* at 496–497.

Since gender-based discrimination had not been shown to exist either by the terms of the plan or by its effect, there was no need to reach the question of what sort of standard would govern our review had there been such a showing. See *Frontiero* v. *Richardson,* 411 U. S. 677 (1973); *Reed* v. *Reed,* 404 U. S. 71 (1971).

The Court of Appeals was therefore wrong in concluding that the reasoning of *Geduldig* was not applicable to an action under Title VII. Since it is a finding of sex-based discrimination that must trigger, in a case such as this, the finding of an unlawful employment practice under § 703 (a)(1), *Geduldig* is precisely in point in its holding that an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all.

There is no more showing in this case than there was in *Geduldig* that the exclusion of pregnancy benefits is a mere "pretex[t] designed to effect an invidious discrimination against the members of one sex or the other." The Court of Appeals expressed the view that the decision in *Geduldig* had actually turned on whether or not a conceded discrimination was "invidious" but we think that in so doing it misread the quoted language from our opinion. As we noted in that opinion, a distinction which on its face is not sex related might nonetheless violate the Equal Protection Clause if it were in fact a subterfuge to accomplish a forbidden discrimination. But we have here no question of excluding a disease or disability comparable in all other respects to covered diseases or disabilities and yet confined to the members of one race or sex. Pregnancy is, of course, confined to women, but it is in other ways significantly different from the typical covered disease or disability. The District Court found that it is not a "disease" at all, and is often a voluntarily undertaken and desired condition, 375 F. Supp., at 375, 377. We do not therefore infer that the exclusion of pregnancy disability benefits from petitioner's plan is a simple pretext for discriminating against women. . The contrary arguments adopted by the lower courts and expounded by our dissenting Brethren were largely rejected in *Geduldig*.

The instant suit was grounded on Title VII rather than the Equal Protection Clause, and our cases recognize that

a prima facie violation of Title VII can be established in some circumstances upon proof that the *effect* of an otherwise facially neutral plan or classification is to discriminate against members of one class or another. See *Washington* v. *Davis,* 426 U. S. 229, 246–248 (1976). For example, in the context of a challenge, under the provisions of § 703 (a)(2),[13] to a facially neutral employment test, this Court held that a prima facie case of discrimination would be established if, even absent proof of intent, the consequences of the test were "invidiously to discriminate on the basis of racial or other impermissible classification," *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 431 (1971). Even assuming that it is not necessary in this case to prove intent to establish a prima facie violation of § 703 (a)(1), but cf. *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802–806 (1973), the respondents have not made the requisite showing of gender-based effects.[14]

As in *Geduldig,* respondents have not attempted to meet the burden of demonstrating a gender-based discriminatory effect resulting from the exclusion of pregnancy-related disabilities from coverage.[15] Whatever the ultimate

---

[13] This subsection provides that it shall be an unlawful employment practice for an employer

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2 (a)(2).

[14] Respondents, who seek to establish discrimination, have the traditional civil litigation burden of establishing that the acts they complain of constituted discrimination in violation of Title VII. *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425 (1975); *McDonnell Douglas Corp.* v. *Green,* 411 U. S., at 802. In *Griggs,* the burden placed on the employer "of showing that any given requirement must have a manifest relationship to the employment in question," 401 U. S., at 432, did not arise until discriminatory effect had been shown, *Albemarle, supra,* at 425.

[15] Absent a showing of gender-based discrimination, as that term is

probative value of the evidence introduced before the District Court on this subject in the instant case, at the very least it tended to illustrate that the selection of risks covered by the Plan did not operate, in fact, to discriminate against women. As in *Geduldig,* we start from the indisputable baseline that "[t]he fiscal and actuarial benefits of the program . . . accrue to members of both sexes," 417 U. S., at 497 n. 20. We need not disturb the findings of the District Court to note that neither is there a finding, nor was there any evidence which would support a finding, that the financial benefits of the Plan "worked to discriminate against any definable group or class in terms of the aggregate risk protection derived by that group or class from the program," *id.,* at 496. The Plan, in effect (and for all that appears), is nothing more than an insurance package, which covers some risks, but excludes others, see *id.,* at 494, 496–497.[16] The "package" going to relevant identifiable groups we are presently concerned with—General Electric's male and female employees—covers exactly the same categories of risk, and is facially nondiscriminatory in the sense that "[t]here is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.,* at 496–497. As there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme simply because women disabled as a result of pregnancy do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability-benefits plan is less

---

defined in *Geduldig,* or a showing of gender-based effect, there can be no violation of § 703 (a) (1).

[16] That General Electric self-insures does not change the fact that it is, in effect, acting as an insurer, just as the State of California was acting in *Geduldig,* 417 U. S., at 492.

than all-inclusive.[17]   For all that appears, pregnancy-related disabilities constitute an *additional* risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike, which results from the facially evenhanded *inclusion* of risks.   To hold otherwise would endanger the commonsense notion that an employer who has no disability benefits program at all does not violate Title VII even though the "underinclusion" of risks impacts, as a result

---

[17] Absent proof of different values, the cost to "insure" against the risks is, in essence, nothing more than extra compensation to the employees, in the form of fringe benefits.   If the employer were to remove the insurance fringe benefits and, instead, increase wages by an amount equal to the cost of the "insurance," there would clearly be no gender-based discrimination, even though a female employee who wished to purchase disability insurance that covered all risks would have to pay more than would a male employee who purchased identical disability insurance, due to the fact that her insurance had to cover the "extra" disabilities due to pregnancy.   While respondents seem to acknowledge that the failure to provide any benefit plan at all would not constitute sex-based discrimination in violation of Title VII, see n. 18, *infra*, they illogically also suggest that the present scheme does violate Title VII because:

"A female must spend her own money to buy a personal disability policy covering pregnancy disability if she wants to be fully insured against a period of disability without income, whereas a male without extra expenditure is fully insured by GE against every period of disability."

Supplemental Brief for Respondents on Reargument 11.   Yet, in both cases—the instant case and the case where there is no disability coverage at all—the ultimate result is that a woman who wished to be fully insured would have to pay an incremental amount over her male counterpart due solely to the possibility of pregnancy-related disabilities.   Title VII's proscription on discrimination does not, in either case, require the employer to pay that incremental amount.   The District Court was wrong in assuming, as it did, 375 F. Supp., at 383, that Title VII's ban on employment discrimination necessarily means that "greater economic benefit[s]" must be required to be paid to one sex or the other because of their differing roles in "the scheme of human existence."

of pregnancy-related disabilities, more heavily upon one gender than upon the other.[18]   Just as there is no facial gender-based discrimination in that case, so, too, there is none here.

### III

We are told, however, that this analysis of the congressional purpose underlying Title VII is inconsistent with the guidelines of the EEOC, which, it is asserted, are entitled to "great deference" in the construction of the Act, *Griggs*, 401 U. S., at 433–434; *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542, 545 (1971) (MARSHALL, J., concurring).   The guideline upon which respondents rely most heavily was promulgated in 1972, and states in pertinent part:

> "Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available

---

[18] Respondents tacitly admit that this . situation would not violate Title VII. They acknowledge that "GE had no obligation to establish any fringe benefit program," Brief for Respondents 143. Moreover, the difficulty with their contention that General Electric engaged in impermissible sex discrimination is vividly portrayed in their closing suggestion that "[i]f paying for pregnancy discriminates within the sphere of classification by sex, so does the failure to pay," Response of Respondents to Reply Brief for Petitioner on Reargument 7. As that statement, and its converse, indicate, perceiving the issue in terms of "sex discrimination" quickly places resolution of this issue into a no-win situation. See also Supplemental Brief for Respondents on Reargument 59 ("[W]e believe that imposing on employees either unequal costs when benefits are equal or unequal benefits when costs are equal violates the right of each individual employee to be treated equally with each individual employee of the opposite sex . . ."). Troublesome interpretative problems such as this reinforce our belief that Congress, in prohibiting sex-based discrimination in Title VII, did not intend to depart from the longstanding meaning of "discrimination," cf. *Jefferson* v. *Hackney*, 406 U. S. 535, 548–549 (1972).

in connection with employment. . . . [Benefits] shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 CFR § 1604.10 (b) (1975).[19]

In evaluating this contention it should first be noted that Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title. *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 431 (1975).[20] This does not mean that EEOC guidelines are not entitled to consideration in determining legislative intent, see *Albemarle, supra; Griggs* v. *Duke Power Co., supra,* at 433–434; *Espinoza* v. *Farah Mfg. Co.,* 414 U. S. 86, 94 (1973). But it does mean that courts properly may accord less weight to such guidelines than to administrative regulations which Congress has declared shall have the force of law, see *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 484 (1942), or to regulations which under the enabling statute may themselves supply the basis for imposition of liability, see, *e. g.,* § 23 (a), Securities Exchange Act of 1934, 15 U. S. C. § 78w (a). The most comprehensive statement of the role of interpretative rulings such as the EEOC guidelines is found in *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944), where the Court said:

"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not

---

[19] The other regulation cited by respondents, 29 CFR § 1604.9 (b) (1975), simply restates the statutory proposition that it is an unlawful employment practice to discriminate "between men and women with regard to fringe benefits."

[20] The EEOC has been given "authority from time to time to issue . . . suitable procedural regulations to carry out the provisions of this subchapter," § 713 (a), 42 U. S. C. § 2000e–12 (a). No one contends, however, that the above-quoted regulation is procedural in nature or in effect.

controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

The EEOC guideline in question does not fare well under these standards. It is not a contemporaneous interpretation of Title VII, since it was first promulgated eight years after the enactment of that Title. More importantly, the 1972 guideline flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute. An opinion letter by the General Counsel of the EEOC, dated October 17, 1966, states:

"You have requested our opinion whether the above exclusion of pregnancy and childbirth as a disability under the long-term salary continuation plan would be in violation of Title VII of the Civil Rights Act of 1964.

"In a recent opinion letter regarding pregnancy, we have stated, 'The Commission policy in this area does not seek to compare an employer's treatment of illness or injury with his treatment of maternity since maternity is a temporary disability unique to the female sex and more or less to be anticipated during the working life of most women employees.' Therefore, it is our opinion that according to the facts stated above, a company's group insurance program which covers hospital and medical expenses for the delivery of employees' children, but excludes from its long-term salary continuation program those disabilities which result from pregnancy and childbirth would not be in violation of Title VII." App. 721–722.

A few weeks later, in an opinion letter expressly issued pursuant to 29 CFR § 1601.30 (1975), the EEOC's position was that "an insurance or other benefit plan may simply exclude maternity as a covered risk, and such an exclusion would not in our view be discriminatory," App. 735.

We have declined to follow administrative guidelines in the past where they conflicted with earlier pronouncements of the agency. *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 858–859, n. 25 (1975); *Espinoza* v. *Farah Mfg. Co., supra,* at 92–96. In short, while we do not wholly discount the weight to be given the 1972 guideline, it does not receive high marks when judged by the standards enunciated in *Skidmore, supra.*

There are also persuasive indications that the more recent EEOC guideline sharply conflicts with other indicia of the proper interpretation of the sex-discrimination provisions of Title VII. The legislative history of Title VII's prohibition of sex discrimination is notable primarily for its brevity. Even so, however, Congress paid especial attention to the provisions of the Equal Pay Act, 29 U. S. C. § 206 (d),[21] when it amended § 703 (h) of Title VII by adding the following sentence:

"It shall not be an unlawful employment practice under

---

[21] Section 6 (d) (1) of the Equal Pay Act, 29 U. S. C. § 206 (d) (1), provides, in pertinent part:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . ."

this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206 (d) of Title 29." 42 U. S. C. § 2000e–2 (h).

This sentence was proposed as the Bennett Amendment to the Senate bill, 110 Cong. Rec. 13647 (1964), and Senator Humphrey, the floor manager of the bill, stated that the purpose of the amendment was to make it "unmistakably clear" that "differences of treatment in industrial benefit plans, including earlier retirement options for women, may continue in operation under this bill, if it becomes law," *id.*, at 13663–13664. Because of this amendment, interpretations of § 6 (d) of the Equal Pay Act are applicable to Title VII as well, and an interpretive regulation promulgated by the Wage and Hour Administrator under the Equal Pay Act explicitly states:

"If employer contributions to a plan providing insurance or similar benefits to employees are equal for both men and women, no wage differential prohibited by the equal pay provisions will result from such payments, even though the benefits which accrue to the employees in question are greater for one sex than for the other. The mere fact that the employer may make unequal contributions for employees of opposite sexes in such a situation will not, however, be considered to indicate that the employer's payments are in violation of section 6 (d), if the resulting benefits are equal for such employees." 29 CFR § 800.116 (d) (1975).

Thus, even if we were to depend for our construction of the critical language of Title VII solely on the basis of "deference" to interpretative regulations by the appro-

priate administrative agencies, we would find ourselves pointed in diametrically opposite directions by the conflicting regulations of the EEOC, on the one hand, and the Wage and Hour Administrator, on the other. Petitioner's exclusion of benefits for pregnancy disability would be declared an unlawful employment practice under § 703 (a)(1), but would be declared not to be an unlawful employment practice under § 703 (h).

We are not reduced to such total abdication in construing the statute. The EEOC guideline of 1972, conflicting as it does with earlier pronouncements of that agency, and containing no suggestion that some new source of legislative history had been discovered in the intervening eight years, stands virtually alone. Contrary to it are the consistent interpretation of the Wage and Hour Administrator, and the quoted language of Senator Humphrey, the floor manager of Title VII in the Senate. They support what seems to us to be the "plain meaning" of the language used by Congress when it enacted § 703 (a)(1).

The concept of "discrimination," of course, was well known at the time of the enactment of Title VII, having been associated with the Fourteenth Amendment for nearly a century, and carrying with it a long history of judicial construction. When Congress makes it unlawful for an employer to "discriminate . . . because of . . . sex . . . ," without further explanation of its meaning, we should not readily infer that it meant something different from what the concept of discrimination has traditionally meant, cf. *Morton* v. *Mancari,* 417 U. S. 535, 549 (1974); *Ozawa* v. *United States,* 260 U. S. 178, 193 (1922). There is surely no reason for any such inference here, see *Gemsco* v. *Walling,* 324 U. S. 244, 260 (1945).

We therefore agree with petitioner that its disability-benefits plan does not violate Title VII because of its failure

to cover pregnancy-related disabilities. The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Stewart, concurring.

I join the opinion of the Court holding that General Electric's exclusion of benefits for disability during pregnancy is not a *per se* violation of § 703 (a)(1) of Title VII, and that the respondents have failed to prove a discriminatory effect. Unlike my Brother Blackmun, I do not understand the opinion to question either *Griggs* v. *Duke Power Co.*, 401 U. S. 424, specifically, or the significance generally of proving a discriminatory effect in a Title VII case.

Mr. Justice Blackmun, concurring in part.

I join the judgment of the Court and concur in its opinion insofar as it holds (a) that General Electric's exclusion of disability due to pregnancy is not, *per se*, a violation of § 703 (a)(1) of Title VII; (b) that the plaintiffs in this case therefore had at least the burden of proving discriminatory effect; and (c) that they failed in that proof. I do not join any inference or suggestion in the Court's opinion—if any such inference or suggestion is there—that effect may never be a controlling factor in a Title VII case, or that *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), is no longer good law.

Mr. Justice Brennan, with whom Mr. Justice Marshall concurs, dissenting.

The Court holds today that without violating Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, a private employer may adopt a disability plan that compensates employees for all temporary disabilities except one affecting exclusively women, pregnancy. I respectfully dissent. Today's holding not only repudiates the applicable administrative guideline promulgated by the agency charged by Con-

gress with implementation of the Act, but also rejects the unanimous conclusion of all six Courts of Appeals that have addressed this question. See *Communications Workers* v. *American Tel. & Tel.*, 513 F. 2d 1024 (CA2 1975), cert. pending, No. 74–1601; *Wetzel* v. *Liberty Mut. Ins. Co.*, 511 F. 2d 199 (CA3 1975), vacated on jurisdictional grounds, 424 U. S. 737 (1976); *Gilbert* v. *General Electric Co.*, 519 F. 2d 661 (CA4 1975) (this case); *Tyler* v. *Vickery*, 517 F. 2d 1089, 1097–1099 (CA5 1975); *Satty* v. *Nashville Gas Co.*, 522 F. 2d 850 (CA6 1975), cert. pending, No. 75–536; *Hutchison* v. *Lake Oswego School Dist. No. 7*, 519 F. 2d 961 (CA9 1975), cert. pending, No. 75–1049.

I

This case is unusual in that it presents a question the resolution of which at first glance turns largely upon the conceptual framework chosen to identify and describe the operational features of the challenged disability program. By directing their focus upon the risks excluded from the otherwise comprehensive program, and upon the purported justifications for such exclusions, the Equal Employment Opportunity Commission, the women plaintiffs, and the lower courts reason that the pregnancy exclusion constitutes a prima facie violation of Title VII. This violation is triggered, they argue, because the omission of pregnancy from the program has the intent and effect of providing that "only women [are subjected] to a substantial risk of total loss of income because of temporary medical disability." Brief for EEOC as *Amicus Curiae* 12.

The Court's framework is diametrically different. It views General Electric's plan as representing a gender-free assignment of risks in accordance with normal actuarial techniques. From this perspective the lone exclusion of pregnancy is not a violation of Title VII insofar as all other disabilities are mutually covered for both sexes. This reasoning relies primarily upon the descriptive statement borrowed from

*Geduldig* v. *Aiello,* 417 U. S. 484, 496–497 (1974): "There is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Ante,* at 138. According to the Court, this assertedly neutral sorting process precludes the pregnancy omission from constituting a violation of Title VII.

Presumably, it is not self-evident that either conceptual framework is more appropriate than the other, which can only mean that further inquiry is necessary to select the more accurate and realistic analytical approach. At the outset, the soundness of the Court's underlying assumption that the plan is the untainted product of a gender-neutral risk-assignment process can be examined against the historical backdrop of General Electric's employment practices and the existence or nonexistence of gender-free policies governing the inclusion of compensable risks. Secondly, the resulting pattern of risks insured by General Electric can then be evaluated in terms of the broad social objectives promoted by Title VII. I believe that the first inquiry compels the conclusion that the Court's assumption that General Electric engaged in a gender-neutral risk-assignment process is purely fanciful. The second demonstrates that the EEOC's interpretation that the exclusion of pregnancy from a disability insurance plan is incompatible with the overall objectives of Title VII has been unjustifiably rejected.

## II

*Geduldig* v. *Aiello, supra,* purports to be the starting point for the Court's analysis. There a state-operated disability insurance system containing a pregnancy exclusion was held not to violate the Equal Protection Clause. Although it quotes primarily from one footnote of that opinion at some length, *ante,* at 134–135, the Court finally does not grapple with *Geduldig* on its own terms.

Considered most favorably to the Court's view, *Geduldig* established the proposition that a pregnancy classification

standing alone cannot be said to fall into the category of classifications that rest explicitly on "gender as such," 417 U. S., at 496 n. 20. Beyond that, *Geduldig* offers little analysis helpful to decision of this case. Surely it offends common sense to suggest, *ante,* at 136, that a classification revolving around pregnancy is not, at the minimum, strongly "sex related." See, *e. g., Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 652 (1974) (POWELL, J., concurring). Indeed, even in the insurance context where neutral actuarial principles were found to have provided a legitimate and independent input into the decisionmaking process, *Geduldig's* outcome was qualified by the explicit reservation of a case where it could be demonstrated that a pregnancy-centered differentiation is used as a "mere pretext . . . designed to effect an invidious discrimination against the members of one sex. . . ." 417 U. S., at 496–497, n. 20.

Thus, *Geduldig* itself obliges the Court to determine whether the exclusion of a sex-linked disability from the universe of compensable disabilities was actually the product of neutral, persuasive actuarial considerations, or rather stemmed from a policy that purposefully downgraded women's role in the labor force. In *Geduldig,* that inquiry coupled with the normal presumption favoring legislative action satisfied the Court that the pregnancy exclusion in fact was prompted by California's legitimate fiscal concerns, and therefore that California did not deny equal protection in effectuating reforms " 'one step at a time.' " *Id.,* at 495. But the record in this case makes such deference impossible here. Instead, in reaching its conclusion that a showing of purposeful discrimination has not been made, *ante,* at 136, the Court simply disregards a history of General Electric practices that have served to undercut the employment opportunities of women who become pregnant while employed.[1] More-

---

[1] General Electric's disability program was developed in an earlier era when women openly were presumed to play only a minor and temporary

over, the Court studiously ignores the undisturbed conclusion of the District Court that General Electric's "discriminatory attitude" toward women was "a motivating factor in its policy," 375 F. Supp. 367, 383 (ED Va. 1974), and that the pregnancy exclusion was "neutral [neither] on its face" nor "in its intent." *Id.*, at 382.[2]

Plainly then, the Court's appraisal of General Electric's policy as a neutral process of sorting risks and "not a gender-based discrimination at all," *ante*, at 136, cannot easily be squared with the historical record in this case. The Court,

---

role in the labor force. As originally conceived in 1926, General Electric offered no benefit plan to its female employees because " 'women did not recognize the responsibilities of life, for they probably were hoping to get married soon and leave the company.' " App. 958, excerpted from D. Loth, Swope of G. E.: Story of Gerard Swope and General Electric in American Business (1958). It was not until the 1930's and 1940's that the company made female employees eligible to participate in the disability program. In common with general business practice, however, General Electric continued to pursue a policy of taking pregnancy and other factors into account in order to scale women's wages at two-thirds the level of men's. *Id.*, at 1002. More recent company policies reflect common stereotypes concerning the potentialities of pregnant women, see, *e. g., Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 644 (1974), and have coupled forced maternity leave with the nonpayment of disability payments. Thus, the District Court found: "In certain instances it appears that the pregnant employee was required to take leave of her position three months prior to birth and not permitted to return until six weeks after the birth. In other instances the periods varied . . . . In short, of all the employees it is only pregnant women who have been required to cease work regardless of their desire and physical ability to work and only they have been required to remain off their job for an arbitrary period after the birth of their child." 375 F. Supp. 367, 385. In February 1973, approximately coinciding with commencement of this suit, the company abandoned its forced-maternity-leave policy by formal directive.

[2] The Court of Appeals did not affirm on the basis of this finding, since it concluded that "the statute looks to 'consequences,' not intent," and "[a]ny discrimination, such as that here, which is 'inextricably sex-linked' in consequences and result is violative of the Act." 519 F. 2d 661, 664.

therefore, proceeds to a discussion of purported neutral criteria that suffice to explain the lone exclusion of pregnancy from the program. The Court argues that pregnancy is not "comparable" to other disabilities since it is a "voluntary" condition rather than a "disease." *Ibid.* The fallacy of this argument is that even if "non-voluntariness" and "disease" are to be construed as the operational criteria for inclusion of a disability in General Electric's program, application of these criteria is inconsistent with the Court's gender-neutral interpretation of the company's policy.

For example, the characterization of pregnancy as "voluntary" [3] is not a persuasive factor, for as the Court of Appeals correctly noted, "other than for childbirth disability, [General Electric] had never construed its plan as eliminating *all* so-called 'voluntary' disabilities," including sport injuries, attempted suicides, venereal disease, disabilities incurred in the commission of a crime or during a fight, and elective cosmetic surgery. 519 F. 2d, at 665. Similarly, the label "disease" rather than "disability" cannot be deemed determinative since General Electric's pregnancy disqualification also excludes the 10% of pregnancies that end in debilitating miscarriages, 375 F. Supp., at 377, the 10% of cases where pregnancies are complicated by "diseases" in the intuitive sense of the word, *ibid.*, and cases where women recovering from childbirth are stricken by severe diseases unrelated to pregnancy.[4]

---

[3] Of course, even the proposition that pregnancy is a voluntary condition is overbroad, for the District Court found that "a substantial incidence of negligent or accidental conception also occurs." 375 F. Supp., at 377. I may assume, however, for purposes of this argument, that the high incidence of voluntary pregnancies and the inability to differentiate between voluntary and involuntary conceptions, except perhaps through obnoxious, intrusive means, could justify the decision-maker's treating pregnancies as voluntarily induced.

[4] The experience of one of the class plaintiffs is instructive of the reach of the pregnancy exclusion. On April 5, 1972, she took a pregnancy leave, delivering a stillborn baby some nine days later. Upon her return

Moreover, even the Court's principal argument for the plan's supposed gender neutrality cannot withstand analysis. The central analytical framework relied upon to demonstrate the absence of discrimination is the principle described in *Geduldig*: "There is no risk from which men are protected and women are not . . . [and] no risk from which women are protected and men are not." 417 U. S., at 496–497, quoted, *ante,* at 138. In fostering the impression that it is faced with a mere underinclusive assignment of risks in a gender-neutral fashion—that is, all other disabilities are insured irrespective of gender—the Court's analysis proves to be simplistic and misleading. For although all mutually contractible risks are covered irrespective of gender, but see n. 4 *supra,* the plan also insures risks such as prostatectomies, vasectomies, and circumcisions that are specific to the reproductive system of men and for which there exist no female counterparts covered by the plan. Again, pregnancy affords the only disability, sex-specific or otherwise, that is excluded from coverage.[5] Accordingly, the District Court appropriately re-

home, she suffered a blood clot in the lung, a condition unrelated to her pregnancy, and was rehospitalized. The company declined her claim for disability payments on the ground that pregnancy severed her eligibility under the plan. See *id.,* at 372. Had she been separated from work for any other reason—for example, during a work stoppage—the plan would have fully covered the embolism.

[5] Indeed, the shallowness of the Court's "underinclusive" analysis is transparent. Had General Electric assembled a catalogue of all ailments that befall humanity, and then systematically proceeded to exclude from coverage *every* disability that is female-specific or predominantly afflicts women, the Court could still reason as here that the plan operates equally: Women, like men, would be entitled to draw disability payments for their circumcisions and prostatectomies, and neither sex could claim payment for pregnancies, breast cancer, and the other excluded female-dominated disabilities. Along similar lines, any disability that occurs disproportionately in a particular group—sickle-cell anemia, for example—could be freely excluded from the plan without troubling the Court's analytical approach.

marked: "[T]he concern of defendants in reference to pregnancy risks, coupled with the apparent lack of concern regarding the balancing of other statistically sex-linked disabilities, buttresses the Court's conclusion that the discriminatory attitude characterized elsewhere in the Court's findings was in fact a motivating factor in its policy." 375 F. Supp., at 383.

If decision of this case, therefore, turns upon acceptance of the Court's view of General Electric's disability plan as a sex-neutral assignment of risks, or plaintiffs' perception of the plan as a sex-conscious process expressive of the secondary status of women in the company's labor force, the history of General Electric's employment practices and the absence of definable gender-neutral sorting criteria under the plan warrant rejection of the Court's view in deference to the plaintiffs'. Indeed, the fact that the Court's frame of reference lends itself to such intentional, sex-laden decisionmaking makes clear the wisdom and propriety of the EEOC's contrary approach to employment disability programs.

## III

Of course, the demonstration of purposeful discrimination is not the only ground for recovery under Title VII. Notwithstanding unexplained and inexplicable implications to the contrary in the majority opinion,[6] this Court, see *Washing-*

---

[6] The cryptic "but cf." citation to *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), *ante,* at 137, is perhaps the most mystifying. *McDonnell* involved a private nonclass action under § 703 (a)(1) of Title VII in which the plaintiff explicitly complained that he was discharged from employment for racial, rather than licit, motives. 411 U. S., at 796. In such a case, where questions of motivation openly form the thrust of an individual plaintiff's complaint, the "effects" that company policies may have had on an entire class of persons understandably are only tangentially placed in issue, see *id.,* at 805 n. 19. Even so, the Court expressly held that a prima facie violation of Title VII could be proved without affirmatively demonstrating that purposeful discrimination had occurred. Instead, the Court concluded that such an illicit purpose

*ton* v. *Davis*, 426 U. S. 229, 238–239 (1976); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 422 (1975); *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 802 (1973); *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 432 (1971), and every Court of Appeals [7] now have firmly settled that a

is inferable from the interplay of four factors which together reveal that the employers' policies have worked to disadvantage the complainant vis-à-vis other prospective employees. See *id.*, at 802. Only if the employer then satisfies the burden of articulating "some legitimate, non-discriminatory reason for the employee's rejection," *ibid.*, must the latter actually seek to establish an intent to discriminate. *Id.*, at 804. Even at this juncture, however, *McDonnell* makes clear that statistical evidence of the racial composition of the labor force—that is, a statistical showing of adverse impact on the protected group of which the individual plaintiff is part—will be persuasive evidence that the failure to rehire the particular complainant "conformed to a general pattern of discrimination against" his group. *Id.*, at 805. Thus, *McDonnell* went far in allowing proof of "effect," even in the setting of an individualized rather than group claim of discrimination.

Equally unacceptable is the implication in the penultimate paragraph of the opinion, *ante*, at 145, that the Fourteenth Amendment standard of discrimination is coterminous with that applicable to Title VII. Not only is this fleeting dictum irrelevant to the reasoning that precedes it, not only does it conflict with a long line of cases to the contrary, *infra*, at 153, and this page, but it is flatly contradicted by the central holding of last Term's *Washington* v. *Davis*, 426 U. S. 229, 239 (1976): "We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today."

[7] See *Boston Chapter, NAACP* v. *Beecher*, 504 F. 2d 1017, 1020 (CA1 1974); *United States* v. *Wood, Wire & Metal Lathers, Local Union 46*, 471 F. 2d 408, 414 n. 11 (CA2 1973); *Pennsylvania* v. *O'Neill*, 473 F. 2d 1029 (CA3 1973) (en banc); *United States* v. *Chesapeake & Ohio R. Co.*, 471 F. 2d 582, 586 (CA4 1972); *United States* v. *Hayes Int'l Corp.*, 456 F. 2d 112, 120 (CA5 1972); *United States* v. *Masonry Contractors Assn. of Memphis, Inc.*, 497 F. 2d 871, 875 (CA6 1974); *United States* v. *Carpenters*, 457 F. 2d 210, 214 (CA7 1972); *United States* v. *N. L. Industries, Inc.*, 479 F. 2d 354, 368 (CA8 1973); *United States* v. *Ironworkers Local 86*, 443 F. 2d 544, 550–551 (CA9 1971); *Muller* v. *United States Steel Corp.*, 509 F. 2d 923, 927 (CA10 1975); *Davis* v. *Washington*, 168 U. S.

prima facie violation of Title VII, whether under § 703 (a)(1) or § 703 (a)(2), also is established by demonstrating that a facially neutral classification has the *effect* of discriminating against members of a defined class.

General Electric's disability program has three divisible sets of effects. First, the plan covers all disabilities that mutually afflict both sexes. But see n. 4, *supra.* Second, the plan insures against all disabilities that are male-specific or have a predominant impact on males. Finally, all female-specific and female-impacted disabilities are covered, except for the most prevalent, pregnancy. The Court focuses on the first factor—the equal inclusion of mutual risks—and therefore understandably can identify no discriminatory effect arising from the plan. In contrast, the EEOC and plaintiffs rely upon the unequal exclusion manifested in effects two and three to pinpoint an adverse impact on women. However one defines the profile of risks protected by General Electric, the determinative question must be whether the social policies and aims to be furthered by Title VII and filtered through the phrase "to discriminate" contained in § 703 (a)(1) fairly forbid an ultimate pattern of coverage that insures all risks except a commonplace one that is applicable to women but not to men.

As a matter of law and policy, this is a paradigm example of the type of complex economic and social inquiry that Congress wisely left to resolution by the EEOC pursuant to its Title VII mandate. See H. R. Rep. No. 92–238, p. 8 (1972). And, accordingly, prior Title VII decisions have consistently acknowledged the unique persuasiveness of EEOC

App. D. C. 42, 46, 512 F. 2d 956, 960 (1975), rev'd on constitutional grounds, 426 U. S. 229 (1976).

Indeed, following *Griggs,* Congress in 1972 revised Title VII, and expressly endorsed use of the "effect only" test outlined therein in identifying "increasingly complex" "forms and incidents of discrimination" that "may not appear obvious at first glance." See H. R. Rep. No. 92–238, p. 8 (1972).

interpretations in this area. These prior decisions, rather than providing merely that Commission guidelines are "entitled to consideration," as the Court allows, *ante,* at 141, hold that the EEOC's interpretations should receive "great deference." *Albemarle Paper Co.* v. *Moody, supra,* at 431; *Griggs* v. *Duke Power Co., supra,* at 433–434; *Phillips* v. *Martin Marietta Corp.,* 400 U. S. 542, 545 (1971) (MARSHALL, J., concurring). Nonetheless, the Court today abandons this standard in order squarely to repudiate the 1972 Commission guideline providing that "[d]isabilities caused or contributed to by pregnancy . . . are, for all job-related purposes, temporary disabilities . . . [under] any health or temporary disability insurance or sick leave plan . . . ." 29 CFR § 1604.10 (b) (1975). This rejection is attributed to two interrelated events: an 8-year delay between Title VII's enactment and the promulgation of the Commission's guideline, and interim letters by the EEOC's General Counsel expressing the view that pregnancy is not necessarily includable as a compensable disability. Neither event supports the Court's refusal to accord "great deference" to the EEOC's interpretation.

It is true, as noted, *ante,* at 143, that only brief mention of sex discrimination appears in the early legislative history of Title VII. It should not be surprising, therefore, that the EEOC, charged with a fresh and uncharted mandate, candidly acknowledged that further study was required before the contours of sex discrimination as proscribed by Congress could be defined. See 30 Fed. Reg. 14927 (1965). Although proceeding cautiously, the Commission from the outset acknowledged the relationship between sex discrimination and pregnancy, announcing that "policies would have to be devised which afforded female employees reasonable job protection during periods of pregnancy." EEOC First Annual Report to Congress, Fiscal Year 1965–1966, p. 40 (1967). During the succeeding seven years, the EEOC worked to develop a coherent policy toward pregnancy-oriented employment practices

both through the pursuit of its normal adjudicatory functions [8] and by engaging in comprehensive studies with such organizations as the President's Citizens' Advisory Council on the Status of Women. See, *e. g.*, Address of Jacqueline G. Gutwillig, Chairwoman, Citizens' Advisory Council, cited in App. 1159. These investigations on the role of pregnancy in the labor market coupled with the Commission's "review . . . [of] its case decisions on maternity preparatory to issuing formal guidelines," *id.*, at 1161, culminated in the 1972 guideline, the agency's first formalized, systematic statement on "employment policies relating to pregnancy and childbirth."

Therefore, while some eight years had elapsed prior to the issuance of the 1972 guideline, and earlier opinion letters had refused to impose liability on employers during this period of deliberation, no one can or does deny that the final EEOC determination followed thorough and well-informed consideration. Indeed, realistically viewed, this extended evaluation of an admittedly complex problem and an unwillingness to impose additional, potentially premature costs on employers during the decisionmaking stages ought to be perceived as a practice to be commended. It is bitter irony that the care that preceded promulgation of the 1972 guideline is today condemned by the Court as tardy indecisiveness, its unwillingness irresponsibly to challenge employers' practices during the formative period is labeled as evidence of inconsistency, and this indecisiveness and inconsistency are bootstrapped into reasons for denying the Commission's interpretation its due deference.

For me, the 1972 guideline represents a particularly conscientious and reasonable product of EEOC deliberations and, therefore, merits our "great deference." Certainly, I can find

---

[8] For synopses of the Commission's positions regarding pregnancy and sex discrimination adopted in the course of administrative decisionmaking and litigation activities, see the EEOC's Annual Reports to Congress.

no basis for concluding that the guideline is out of step with congressional intent. See *Espinoza* v. *Farah Mfg. Co.,* 414 U. S. 86, 94 (1973). On the contrary, prior to 1972, Congress enacted just such a pregnancy-inclusive rule to govern the distribution of benefits for "sickness" under the Railroad Unemployment Insurance Act, 45 U. S. C. § 351 (k)(2). Furthermore, shortly following the announcement of the EEOC's rule, Congress approved and the President signed an essentially identical promulgation by the Department of Health, Education, and Welfare under Title IX of the Education Amendments of 1972, 20 U. S. C. § 1681 (a) (1970 ed., Supp. V). See 45 CFR § 86.57 (c) (1976). Moreover, federal workers subject to the jurisdiction of the Civil Service Commission now are eligible for maternity and pregnancy coverage under their sick leave program. See Federal Personnel Manual, ch. 630, subch. 13, S13–2 (FPM Supp. 990–2, May 6, 1975).

These policy formulations are reasonable responses to the uniform testimony of governmental investigations which show that pregnancy exclusions built into disability programs both financially burden women workers and act to break down the continuity of the employment relationship, thereby exacerbating women's comparatively transient role in the labor force. See, *e. g.,* U. S. Dept. of Commerce, Consumer Income (Series P–60, No. 93, July 1974); Women's Bureau, U. S. Dept. of Labor, Underutilization of Women Workers (rev. ed. 1971). In dictating pregnancy coverage under Title VII, the EEOC's guideline merely settled upon a solution now accepted by every other Western industrial country. Dept. of Health, Education, and Welfare, Social Security Programs Throughout the World, 1971, pp. ix, xviii, xix (Research Report No. 40). I find it difficult to comprehend that such a construction can be anything but a "sufficiently reasonable" one to be "accepted by the reviewing courts." *Train* v. *Natural Resources Def. Council,* 421 U. S. 60, 75 (1975).

The Court's belief that the concept of discrimination cannot reach disability policies effecting "an *additional* risk, unique to women . . . ," *ante*, at 139, is plainly out of step with the decision three Terms ago in *Lau* v. *Nichols*, 414 U. S. 563 (1974), interpreting another provision of the Civil Rights Act. There a unanimous Court recognized that discrimination is a social phenomenon encased in a social context and, therefore, unavoidably takes its meaning from the desired end products of the relevant legislative enactment, end products that may demand due consideration to the uniqueness of "disadvantaged" individuals.[9] A realistic understanding of conditions found in today's labor environment warrants taking pregnancy into account in fashioning disability policies. Unlike the hypothetical situations conjectured by the Court, *ante*, at 139–140, and n. 17, contemporary disability

---

[9] *Lau* held that the failure to provide special language instruction to Chinese-speaking students in San Francisco schools violated the ban against racial or national origin discrimination contained in § 601 of the Civil Rights Act of 1964. The Court concluded that the Act, as interpreted by the administrative regulations promulgated by the Department of Health, Education, and Welfare addressed "*effect*[*s*] [to discriminate] even though no purposeful design is present," and ultimately sought to further the broad goal of insuring "a meaningful opportunity to participate in the [schools'] educational program . . . ." 414 U. S., at 568. Faced with such a generalized objective, the Court repudiated the analysis of the Court of Appeals which had relied upon San Francisco's commitment of equal educational offerings and resources to every child as the basis for concluding that Chinese students have suffered no discrimination due to the failure to adjust the school program to remedy their unique language deficiencies. Instead, the Court agreed that the anti-discrimination language fairly can be read "to require affirmative remedial efforts to give special attention to linguistically deprived children." *Id.*, at 571 (STEWART, J., concurring). Similarly, given the broad social objectives that underlie Title VII, see *infra*, at 160, and General Electric's apparent unhesitancy to take into account the unique physical characteristics of their male workers in defining the breadth of disability coverage, see *supra*, at 152, ample support appears for upholding the EEOC's view that pregnancy must be treated accordingly.

programs are not creatures of a social or cultural vacuum devoid of stereotypes and signals concerning the pregnant woman employee. Indeed, no one seriously contends that General Electric or other companies actually conceptualized or developed their comprehensive insurance programs disability-by-disability in a strictly sex-neutral fashion.[10] Instead, the company has devised a policy that, but for pregnancy, offers protection for all risks, even those that are "unique to" men or heavily male dominated.  In light of this social experience, the history of General Electric's employment practices, the otherwise all-inclusive design of its disability program, and the burdened role of the contemporary working woman, the EEOC's construction of sex discrimination under § 703 (a)(1) is fully consonant with the ultimate objective of Title VII, "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered [sexually] stratified job environments to the disadvantage of [women]." *McDonnell Douglas Corp. v. Green,* 411 U. S., at 800.

I would affirm the judgment of the Court of Appeals.

Mr. Justice Stevens, dissenting.

The word "discriminate" does not appear in the Equal Protection Clause.[1]  Since the plaintiffs' burden of proving a prima facie violation of that constitutional provision is significantly heavier than the burden of proving a prima facie violation of a statutory prohibition against discrimination,[2] the constitutional holding in *Geduldig v. Aiello,* 417

---

[10] See, *e. g.,* n. 1, *supra.*

[1] The word does, however, appear in a number of statutes, but has by no means been given a uniform interpretation in those statutes.  Compare *FTC v. Morton Salt Co.,* 334 U. S. 37, 44–45 (1948) (Robinson-Patman Act) with *NLRB v. Great Dane Trailers,* 388 U. S. 26, 32–35 (1967) (National Labor Relations Act).

[2] *Washington v. Davis,* 426 U. S. 229, 238–248 (1976).

U. S. 484 (1974), does not control the question of statutory interpretation presented by this case. And, of course, when it enacted Title VII of the Civil Rights Act of 1964, Congress could not possibly have relied on language which this Court was to use a decade later in the *Geduldig* opinion.[3] We are, therefore, presented with a fresh, and rather simple, question of statutory construction: Does a contract between a company and its employees which treats the risk of absenteeism caused by pregnancy differently from any other kind of absence discriminate against certain individuals because of their sex?

An affirmative answer to that question would not necessarily lead to a conclusion of illegality, because a statutory affirmative defense might justify the disparate treatment of pregnant women in certain situations. In this case, however, the company has not established any such justification. On the other hand, a negative answer to the threshold question would not necessarily defeat plaintiffs' claim because facially neutral criteria may be illegal if they have a discriminatory effect.[4] An analysis of the effect of a company's rules relating to absenteeism would be appropriate if those rules referred only to neutral criteria, such as whether an absence was voluntary or involuntary, or perhaps particularly costly. This case, however, does not involve rules of that kind.

Rather, the rule at issue places the risk of absence caused by pregnancy in a class by itself.[5] By definition, such a

---

[3] Quite clearly Congress could not have intended to adopt this Court's analysis of sex discrimination because it was seven years after the statute was passed that the Court first intimated that the concept of sex discrimination might have some relevance to equal protection analysis. See *Reed* v. *Reed*, 404 U. S. 71 (1971).

[4] *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–432 (1971).

[5] It is not accurate to describe the program as dividing " 'potential recipients into two groups—pregnant women and nonpregnant persons.' " *Ante,* at 135. Insurance programs, company policies, and employment contracts all deal with future *risks* rather than historic facts. The classifica-

rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male. The analysis is the same whether the rule relates to hiring, promotion, the acceptability of an excuse for absence, or an exclusion from a disability insurance plan. Accordingly, without reaching the questions of motive, administrative expertise, and policy, which MR. JUSTICE BRENNAN so persuasively exposes, or the question of effect to which MR. JUSTICE STEWART and MR. JUSTICE BLACKMUN refer, I conclude that the language of the statute plainly requires the result which the Courts of Appeals have reached unanimously.

---

tion is between persons who face a risk of pregnancy and those who do not.

Nor is it accurate to state that under the plan " '[t]here is no risk from which men are protected and women are not.' " *Ibid.* If the word "risk" is used narrowly, men are protected against the risks associated with a prostate operation whereas women are not. If the word is used more broadly to describe the risk of uncompensated unemployment caused by physical disability, men receive total protection (subject to the 60% and 26-week limitations) against that risk whereas women receive only partial protection.