In re CONSOLIDATED PRETRIAL PROCEEDINGS IN the AIRLINE CASES.

Appeal of AMERICAN AIRLINES, INC., and Trans World Airlines, Inc.

No. 77–1325.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1978.

Decided Aug. 24, 1978.

Laurence A. Carton, Chicago, Ill., for appellant.

Aram A. Hartunian, Chicago, Ill., for appellee.

Before FAIRCHILD, Chief Circuit Judge, and PELL and SPRECHER,* Circuit Judges.

PELL, Circuit Judge.

This is an interlocutory appeal under 28 U.S.C. § 1292(b) of two district court orders. Pretrial proceedings in the district court involved consolidated Title VII [1] class action suits by female flight cabin attendants against American Airlines, Inc. and Trans World Airlines, Inc. (TWA). Subsequent to the filing of this appeal, American entered into a settlement agreement which was challenged and approved on appeal. *Airline Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 573 F.2d 960 (7th Cir. 1978).

### The October 18, 1976 Order

TWA thus remains as the only appellant and appeals from the district court's summary judgment order of October 18, 1976, which held TWA's "motherhood" restrictions prior to October 1970 to be a violation of § 703(a) of the Civil Rights Act, 42 U.S.C. § 2000e–2(a).[2] Specifically, TWA maintained a policy of removing female flight cabin attendants from flight duty while pregnant, and thereafter if a child was born. This policy also extended to female flight cabin attendants who adopted a child. These employees who became mothers either by childbirth or by adoption were terminated permanently unless they were willing to accept employment in ground duty positions. This policy, however, did not apply to their male counterparts. Male cabin attendants, designated "pursers" by TWA, could remain on flight duty after becoming a parent. Although pursers served on international flights, their responsibilities were substantially the same as those of female flight cabin attendants.[3]

TWA challenges the summary judgment on the grounds that: (1) its policy was not gender-based and therefore did not constitute sex discrimination; (2) its policy did not have a discriminatory effect; and (3) if the policy did discriminate on the basis of sex, the discrimination was a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of TWA's business.[4]

---

* Although Judge Sprecher heard oral argument, he later disqualified himself from any participation in the decision, and preparation of the opinion, in this case.

1. Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2. This section provides:
   It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).

3. *See Laffey v. Northwest Airlines, Inc.,* 185 U.S.App.D.C. 322, 332–35, 567 F.2d 429, 439–42 (1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

4. 42 U.S.C. § 2000e–2(e) provides in pertinent part:
   [i]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . . . .

To clarify the challenged portion of TWA's policy, the plaintiff class does not challenge that aspect of TWA's policy which removed female flight cabin attendants from flight duty when they became pregnant. Furthermore, the district court's order, by reference to an earlier order involving American Airlines, specifically stated that this aspect of the policy was not discriminatory. *See Condit v. United Air Lines*, 558 F.2d 1176 (4th Cir. 1977), *cert. denied*, 535 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978). At issue then is only the policy of requiring female cabin attendants who become mothers to resign or accept ground duty positions while not imposing similar restrictions on their male counterparts who become fathers.

In arguing that its policy was not gender-based, TWA relies on *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), in which the Supreme Court held that General Electric's disability benefit plan did not violate Title VII even though it failed to cover pregnancy-related disabilities. To draw support for its argument from *Gilbert*, TWA appears to focus on the maternity leave aspect of its policy and to minimize addressing the only portion of the policy that is at issue the no-motherhood restriction. *Gilbert* clearly provides no support for the proposition that TWA's no-motherhood policy withstands Title VII scrutiny.

TWA's no-motherhood policy in our opinion provides a clear example of sex discrimination prohibited by § 2000e–2(a). The Supreme Court, in applying that provision, has held that an employer may not refuse to hire women with pre-school-age children while hiring men with such children. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). TWA's policy discriminated in the same manner.

TWA next argues that its policy did not have a discriminatory effect. This argument is irrelevant. In Title VII cases,

discriminatory effect becomes an issue when the employer has a facially neutral practice. In those cases, the plaintiffs can establish a prima facie case by proving that the practice has a discriminatory effect. *See Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). We need not reach that issue in the present case because TWA's policy was discriminatory on its face.

Finally, TWA argues that if its policy did discriminate on the basis of sex, the discrimination was a BFOQ reasonably necessary to the normal operation of TWA's business. The BFOQ, often described as an exception to Title VII's general prohibition of sex discrimination, is, at least in the view of one commentator, more accurately designated as a justification for sex discrimination.[5] TWA argues that its no-motherhood policy, albeit discriminatory, was justified as a BFOQ because (1) mothers of young children would have unacceptably high rates of absenteeism, (2) mothers might be subject to overriding domestic concerns that would make them questionable risks for competent performance in times of crisis, and (3) mothers returning from maternity leaves of absence would require expensive retraining.

Our analysis of the BFOQ issue must begin with the Supreme Court's most recent pronouncement in *Dothard v. Rawlinson, supra* at 334, 97 S.Ct. at 2729.

> We are persuaded—by the restrictive language of § 703(e) [§ 2000e–2(e)], the relevant legislative history, and the consistent interpretation of the Equal Employment Opportunity Commission—that the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex.

The Court, in a footnote, also stated that the EEOC's narrow construction of the statute, 29 C.F.R. § 1604.2(a), can be given weight. 433 U.S. at 334 n.19, 97 S.Ct. 2720.

5. For a thorough discussion of the legislative history and the current judicial interpretations of the BFOQ, see Sirota, *Sex Discrimination:* *Title VII and the Bona Fide Occupational Qualification*, 55 Tex.L.Rev. 1025, 1027–33, 1042–50 (1977).

The lower court interpretations of the BFOQ prior to *Dothard* are not entirely consistent.[6] In view of the Supreme Court's recent approbation of "an extremely narrow" construction, we are of the opinion that the Ninth Circuit's construction is the most appropriate. In *Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219 (9th Cir. 1971), that court stated that

> based on the legislative intent and on the Commission's interpretation, sexual characteristics, rather than characteristics that might, to one degree or another, correlate with a particular sex, must be the basis for the application of the BFOQ exception.

444 F.2d at 1225. Thus, attributes that are culturally more common to one sex than the other are an insufficient basis for a BFOQ. Cultural stereotypes should not be employed to justify sex discrimination.

With this background, we now turn to the three issues which TWA argues present genuine issues of material fact on the BFOQ issue sufficient to defeat summary judgment. First, TWA argues that mothers, but not fathers, of young children would have an unacceptably high rate of absenteeism. They submit that absenteeism is a serious problem among flight attendants. This alone, of course, does not address the critical issue of whether female parents have a sexual characteristic different than male parents which would cause them to be absent more often. TWA, in an attempt to raise a genuine issue of material fact, points to the deposition of David J. Crombie, Vice-President of Industrial Relations at TWA, which states that problems of absenteeism have been exacerbated since TWA permitted mothers on flight duty. This is insufficient to defeat summary judgment because he does not attribute the increased absenteeism problem directly to the mothers. Indeed, he presents no evidence nor even states that mothers were absent more often than fathers, information, if it exists, that surely would be available to him.[7] TWA, in its brief, can only state that "[t]he airlines *could not be sure* that absenteeism among flight attendants with young babies would not increase greatly." [Emphasis added.] The whole tenor of its argument is speculative and relies heavily on stereotypical assumptions, a posture which is anathema to the maturing state of Title VII analysis.

TWA next argues that it raised a genuine issue of material fact as to a BFOQ in its allegation that mothers might be subject to overriding domestic concerns that would make them questionable risks for competent performance in times of crisis. In support of this allegation TWA primarily offers affidavits of Dr. L. G. Lederer, Corporate Medical Director of American Airlines, Dr. Charles C. Gullett, Corporate Director Medical Services & Safety Engineering for TWA, and the deposition of David J. Crombie.

Dr. Lederer's affidavit states that a mother's concern for her child, when combined with irregular hours and absences from home at distant locations, would produce psychological stresses which could impair the proper performance of her flight duties. This is insufficient to defeat summary judgment because he fails to contrast the potential effect on performance with that of fathers, the critical issue in this case. Indeed, within the same paragraph, Dr. Lederer states that frequent absences from home and irregular work hours as experienced by *firemen* and *salesmen* contributed to unstable marriages. Therefore, it is not at all clear that his conclusions

---

**6.** *Compare Weeks v. Southern Bell Telephone and Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969), *with Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). *See also Usery v. Tamiami Trail Tours Inc.*, 531 F.2d 224 (5th Cir. 1976). A perceptive analysis of these cases, as well as a comprehensive survey of developments in Title VII jurisprudence, is provided in Lopatka, *A 1977 Primer on the Federal Regulation of Employment Discrimination*, 1977 U.Ill.L.F. 69.

**7.** TWA terminated its no-motherhood policy in October 1970 and thus has had several years to assess the absenteeism problem of mothers *vis-a-vis* fathers, if such a problem exists, and to determine whether it is linked to a sex characteristic.

regarding effects on performance are gender-related.

■ Dr. Gullett's affidavit includes statements similar to those of Dr. Lederer and accordingly fails to defeat summary judgment for the same reasons. Mr. Crombie's deposition similarly fails to raise a genuine issue of material fact. He stated in a conclusory fashion that "the mother of children *could* be so preoccupied with her cares that she *might* be deficient in the performance of those aspects of her job relating to safe transport. . . ." [Emphasis added.] Aside from our uncertainty as to Mr. Crombie's expertise to make such a judgment, we are not persuaded that his conclusions are not based on sex stereotyping that Title VII seeks to eliminate from the employment setting. As this court stated in *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), § 703(a)(1) "subjects to scrutiny and eliminates such irrational impediments to job opportunities and enjoyment which have plagued women in the past." Furthermore, Mr. Crombie's statements do not address the question of whether mothers have a sex characteristic, different than fathers, that would impair their job performance to a greater extent. Characteristics that might, to one degree or another, correlate with a particular sex are insufficient to provide the basis for a BFOQ. *Rosenfeld v. Southern Pacific Co., supra* at 1225. To accept Mr. Crombie's statements as sufficient to raise a genuine issue of material fact requires acquiescence in assumptions steeped in cultural stereotypes, such as that female parents have a more intense concern for their children than male parents, assumptions that are inconsistent with the purposes of the Act.

TWA's third argument to defeat summary judgment is that it raised an issue of fact as to the existence of a BFOQ by its allegation that mothers returning from maternity leaves would require expensive retraining. We are unpersuaded by this argument because it seems clear that retraining a mother returning from maternity leave, albeit an expense to TWA, would be less expensive than training her replacement.

■ We have examined all the other relevant affidavits, depositions, and documents in the record and find them of no additional support to TWA's challenge to the district court's summary judgment. Accordingly, for the reasons stated herein, we hold that the district court properly granted summary judgment in favor of the plaintiffs.[8]

### The October 15, 1976 Order

TWA moved to exclude certain persons from the plaintiff class for lack of subject matter jurisdiction. The class was defined as all female flight cabin attendants who were terminated from employment with TWA on or after July 2, 1965 for reasons of pregnancy.[9] TWA's motion sought to exclude from this class all those employees who were terminated more than 90 days prior to May 31, 1970, the date the original plaintiff class filed its charge with the EEOC. TWA argues that these employees did not fulfill the jurisdictional requirement

---

**8.** Our decision to affirm the summary judgment here may appear inconsistent with language in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971), where the Court, in vacating and remanding a sex discrimination case stated that "conflicting family obligations, if demonstrably more relevant to job performance for a woman than for a man, could arguably be a basis for distinction under § 703(e) of the Act." This language, however, does not categorically state that such considerations, if proved, would constitute a BFOQ. Indeed, after *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), in which the Court accepted an "ex-

tremely narrow" construction of the BFOQ, the court may well be unwilling to accept such considerations as sufficient to constitute a BFOQ. Furthermore, in *Phillips*, the defendant did not raise the BFOQ defense in the lower court and thus the issue was not directly before the Supreme Court.

**9.** Since the pregnancy leave policy is not challenged, but rather the refusal to reinstate after a child is born, we assume the class includes only those who would have resumed flight duty after becoming a mother but for TWA's policy forbidding this.

that a charge must be filed with the EEOC within 90 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(d) (1970 ed.).[10]

The district court denied TWA's motion on the ground that the alleged unlawful employment practice was a "continuing violation" so that even though the termination may have occurred more than 90 days before the plaintiff class filed its charge with the EEOC, the no-motherhood policy, which caused not only the termination, but also the failure to reinstate, continued into the 90-day period and itself constituted an unlawful employment practice which continued until TWA abandoned the policy in October 1970.

The continuing violation theory was created to add some flexibility to an otherwise rigid jurisdictional filing requirement that might often result in the denial of Title VII remedies to employees who have suffered employment discrimination. Although the purpose of the theory is admirable, an application of the theory in its broadest terms would vitiate the filing requirement which, as a jurisdictional prerequisite, also deserves proper respect. Accordingly, we must define the legitimate scope of this theory and determine whether TWA's conduct falls within it.

Courts which have applied the continuing violation theory have not addressed the precise issue in the present case. In *Cox v. United States Gypsum*, 409 F.2d 289 (7th Cir. 1969), several female employees were laid off more than 90 days prior to filing charges with the EEOC. They claimed a continuing violation on the basis that male personnel were hired to perform jobs which the plaintiffs were qualified to perform between the time plaintiffs were laid off and

the time they filed their charges. This court held that although a charge filed more than 90 days after a layoff would be untimely, the plaintiffs' allegations suggested discriminatory recalls sufficient to show that the violation continued up to the filing of charges. 409 F.2d at 290. *Accord, Macklin v. Spector Freight Systems*, 156 U.S.App.D.C. 69, 478 F.2d 979 (1973). *See also Bartmess v. Drewrys U.S.A., Inc.*, 444 F.2d 1186, 1189 (7th Cir. 1971), *cert. denied*, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252.

When the alleged unfair employment practice culminates in termination of employment rather than a layoff, courts have been unwilling to apply the continuing violation theory. In *Terry v. Bridgeport Brass Co.*, 519 F.2d 806 (7th Cir. 1975), the plaintiffs filed their EEOC charge more than eleven months after they were terminated. This court, quoting an opinion of the Eighth Circuit, stated that

> to construe loosely "continuing" discrimination would undermine the theory underlying the statute of limitations. While the continuing discrimination theory may be available to present employees, . . . even though on layoff, . . we do not think this theory has validity when asserted by a former employee.

519 F.2d at 808. For this reason the court held that the EEOC charges were untimely filed and that the court consequently lacked jurisdiction.

The present case is distinguishable from *Cox* because it does not involve layoffs and from *Terry* because *Terry* did not involve the continuation of an articulated policy denying reinstatement for discriminatory reasons.[11] It is also distinguishable from the Supreme Court's recent opinion in *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct.

---

10. In 1972, this section was amended to extend the time limit to 180 days and was renumbered § 2000e–5(e). The amendment does not apply to the present case because these proceedings were initiated in 1970.

11. This latter question of whether the continuation of a discriminatory policy which denies reinstatement constitutes a continuing violation was specifically left open by the Ninth Circuit. In *Collins v. United Air Lines, Inc.*,

514 F.2d 594 (9th Cir. 1975), the plaintiff was forced to resign under a "no-marriage" policy. The policy was then changed and three years later the plaintiff filed a charge with the EEOC. The court held the filing untimely, but specifically stated that it expressed no opinion concerning whether a charge filed within 90 days of the discontinuance of the no-marriage policy would have been timely. 514 F.2d at 596 n.2.

1885, 52 L.Ed.2d 571 (1977). In *Evans*, the plaintiff was terminated in 1968 because of United's no-marriage rule. United discontinued the rule in 1969 and the plaintiff was hired as a new employee in 1972. In 1973, she filed charges with the EEOC and argued that her employment in 1972 without seniority continued the discriminatory effects of the original termination. The Court responded that the hiring practices in 1972 were not discriminatory and that these hiring practices merely gave some present effect to past discrimination. Such "present effect" is not enough to state a claim under Title VII, however, and the Court stated that "the critical question is whether any present *violation* exists." 431 U.S. at 558, 97 S.Ct. at 1889 (emphasis in original). Whether any present violation would have existed had the plaintiff filed while the no-marriage policy was still effective or within 90 days of its discontinuation, was not decided and, in essence, is the issue before us now.[12]

■ Although as we have indicated, there are no cases directly on point, we are unwilling to extend the continuing violation theory, as did the district court, so as to include in the plaintiff class those employees who were permanently terminated more than 90 days before the filing of EEOC charges. We attach significant weight to that point in time when the employment relationship is permanently severed, and we are not alone in this regard. In *Laffey v. Northwest Airlines, Inc.*, 185 U.S.App.D.C. 322, 567 F.2d 429 (D.C.Cir. 1976), the court stated in a similar Title VII class action context that

> [a] severing of the employment relationship ordinarily terminates a discrimination against the severed employee, and activates the time period for filing charges with the Commission concerning any violation which occurred at separation or which may have been continuing up to the date thereof. To hold otherwise would effectively read the timely-filing requirement out of the statute.

185 U.S.App.D.C. at 366, 567 F.2d at 473. *Accord, Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Terry v. Bridgeport Brass Co., supra* at 808; *Collins v. United Air Lines, Inc.,* 514 F.2d 594, 596–97 (9th Cir. 1975). Arguably, the source for the continuing violation is not the termination itself, but the subsequent refusal to reinstate because of the same policy that led to the initial termination. We are of the opinion, however, that the terminations in the present case, which occurred pursuant to a policy which explicitly included a refusal to reinstate, are not meaningfully different than discriminatory terminations which do not articulate a policy refusing reinstatement. In most cases in which an employee is discharged for discriminatory reasons, his or her opportunity for reinstatement is generally foreclosed for the same discriminatory reasons, but courts have required that employee to file an EEOC charge within 90 days after the termination. The addition of an articulated policy precluding reinstatement should not require a different rule. Therefore, it is the continuity of the employment relationship that sustains the violation, and when that relationship is severed, the violation ceases.

Those employees in the present case who were terminated but reinstated in ground duty positions after their maternity leave pursuant to TWA's policy, are in a different position. These employees were properly included in the class because they were subject to a continuing violation. When they resumed employment after becoming a mother, the discriminatory violation, which lay dormant during their pregnancy, was revived; that they were forced to accept a presumably less preferable ground duty position while new employees were hired for flight duty revived the violation and rendered it as to them a continuing one. The position of these employees is closely analogous to the layoffs followed by discrimina-

---

12. Neither the EEOC nor the courts have construed *Evans* as eliminating entirely the continuing violation theory. *See* EEOC Interpretative Memorandum, 46 U.S.L.W. 2028 (July 19, 1977); *Caldwell v. Seaboard Coastline Railroad,* 435 F.Supp. 310 (W.D.N.C.1977).

tory recalls held to be continuing violations in *Cox* and *Macklin*, both *supra*. It is also analogous to a discriminatory failure to promote, held to be a continuing violation in *Clark v. Olinkraft, Inc.,* 556 F.2d 1219, 1223 (5th Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978). *See also Caldwell v. Seaboard Coastline Railroad,* 435 F.Supp. 310 (W.D.N.C.1977). Every time TWA hired a new flight cabin attendant, instead of transferring one of the former stewardesses now on ground duty, it perpetuated the initial violation.

The distinction we have drawn between those terminated employees who returned to employment in ground duty positions and those who did not renew the employment relationship is a delicate but nonetheless important one. The returning employee remains within the ambiance of a continuing relationship of employment and supervision and thus is directly subject to the employer's discriminatory actions. The non-returning employee is outside this ambiance and thus feels at most only the indirect reverberations of those actions. Although the non-returning employee who did not desire to remain as a TWA employee in a non-flight position may arguably suffer some form of discrimination whenever the employer hires a new flight cabin attendant instead of reinstating the terminated employee, the discriminatory impact is diffuse and uncertain. Permanent severance of the employment relationship destroys the ties through which the direct impact of discrimination may be transmitted.

TWA points out with some cogency the inherent difficulties of determining back pay if all members of the class were found entitled to prove what TWA characterizes as "these stale claims": each claim will require adjudication of whether termination was for any reason other than discrimination; a claimant may not recover if she was guilty of concealment of pregnancy; she may not recover if she left work for family reasons; amounts earned or earnable with reasonable diligence by each claimant in other work during recoverable years must be determined in order to reduce back pay under the express provisions of § 706(g); and the evidence concerning the individual and personal facts of hundreds of these claims is sure to be vague and unreliable.

While all of these aspects may be true, we do not deem that difficulty of ascertainment per se is a ground for denying relief where it is legally due. Nevertheless, we cannot put this factor entirely aside in determining the Congressional intent in requiring claims to be litigated only if filed with the EEOC within 90 days after the alleged unlawful employment practice occurred.

■ We hold therefore that the class members who satisfy the jurisdictional 90 day filing requirement are those employees who were terminated permanently[13] during the 90 days prior to the filing of EEOC charges and those employees who were removed from flight duty on or after July 2, 1965 and before the filing of EEOC charges but who were reinstated in ground duty positions and who continued their employment into the 90-day period. While we might rather safely assume that those employees who returned to work in a ground capacity would have preferred to reassume the literally and figuratively higher status of cabin attendants, nevertheless it is not a necessarily true conclusion and therefore these employees must also show that during the 90-day period they were qualified to and would have accepted fight duty had it not been for TWA's policy.

■ As to those employees who have failed to file timely charges with the EEOC, who were terminated more than 90 days before filing of EEOC charges and who did not resume employment in ground duty po-

---

**13.** The proper time for the 90-day period to begin to run is the time of *permanent* termination. Although TWA argues otherwise, we interpret the effect of its policy as resulting in permanent termination when a child was born or adopted. Prior to that time the severance from employment was in actuality a mandatory maternity leave. This is apparent from the fact that a pregnant employee was free to resume employment in flight duty after a miscarriage or in ground duty after childbirth.

sitions, we must now consider whether the employer waived this timeliness defense by failing to plead it affirmatively in its answer. There is no dispute that the employer failed to raise this issue in the pleadings. The critical issue is whether the 90-day period is in the nature of a statute of limitations in which case the doctrines of waiver and estoppel would apply, or is a jurisdictional prerequisite to suit in which case the employer could raise it at any time.[14] We hold the 90-day filing period to be jurisdictional and therefore the employer's failure to plead it did not constitute a waiver.

The language of the statute is clear: A charge under subsection (a) of this section *shall be filed* within ninety days after the alleged unlawful employment practice occurred.

42 U.S.C. § 2000e–5(d) (1970 ed.) (emphasis added).[15] Furthermore, having examined the legislative history of this provision, of which there is very little, we find nothing of significance to indicate that the 90-day filing requirement is not jurisdictional. *But cf. Laffey v. Northwest Airlines, Inc.,* 185 U.S.App.D.C. 322, 368, 567 F.2d 429, 475 n.345 (1976). In *Terry v. Bridgeport Brass Co., supra,* the plaintiffs' Title VII suit was dismissed in the district court because they failed to file charges with the EEOC within 90 days of the alleged unfair employment practice. On appeal, this court affirmed the dismissal stating that "[t]he district court therefore correctly concluded that the charges were untimely filed and that it consequently lacked jurisdiction." 519 F.2d

at 808.[16] Moreover, the Supreme Court has, on several occasions, referred to the 90-day filing requirement as a jurisdictional prerequisite. *See United Air Lines, Inc. v. Evans, supra* 431 U.S. at 555, n.4, 97 S.Ct. 1885; *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Therefore, the employer's failure to raise the filing requirement earlier does not constitute a waiver, nor is the employer estopped from raising it.

The plaintiffs argue that the employer's statements at a March 17, 1972 settlement hearing constitute an express waiver of the filing requirement issue. Although it is questionable whether any concessions made at a settlement hearing should be held to constitute a waiver when the settlement is subsequently overturned, we need not reach this question as our conclusion that this filing requirement was jurisdictional precludes a finding of waiver.

■ Plaintiffs also argue that the employer should be estopped from raising the filing requirement because the employer failed to raise it during the many lengthy proceedings which preceded the employer's motion to amend its answer to raise the issue. Plaintiffs characterize this conduct as "playing fast and loose with the courts," and contend that such conduct is grounds for estoppel. We do not condone the employer's delay in raising the jurisdiction issue, but neither do we accept the plaintiffs'

---

14. Fed.R.Civ.P. 12(h)(3); *United States v. Griffin,* 303 U.S. 226, 229, 58 S.Ct. 601, 82 L.Ed. 764 (1938).

15. *See* note 10 *supra.*

16. *See also Gibson v. Kroger Co.,* 506 F.2d 647, 650 (7th Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1571, 43 L.Ed.2d 779 (1975); *Moore v. Sunbeam Corp.,* 459 F.2d 811, 821 n.6 (7th Cir. 1972); *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 718 (7th Cir. 1969); *Choate v. Caterpillar Tractor Co.,* 402 F.2d 357, 359 (7th Cir. 1968).

Other circuits are split on this issue. *See, e. g., Laffey v. Northwest Airlines, Inc.,* 185 U.S. App.D.C. 322, 368, 567 F.2d 429, 475 (1976); *Dartt v. Shell Oil Co.,* 539 F.2d 1256 (10th Cir. 1976), *aff'd per curiam by an equally divided Court,* 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270

(1977); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 n.8 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *East v. Romine, Inc.,* 518 F.2d 332, 336–37 (5th Cir. 1975); *Reeb v. Economic Opportunity Atlanta, Inc.,* 516 F.2d 924, 928–29 (5th Cir. 1975); *Olson v. Rembrandt,* 511 F.2d 1228, 1231 (8th Cir. 1975).

*Olson* was the 8th Circuit case quoted in *Terry.* We have earlier in this opinion quoted from *Terry* in connection with the discussion of the continuing violation issue. We note that the 8th Circuit did refer to "the statute of limitations" in the *Olson* opinion. *Terry,* however, clearly proceeded on the basis of jurisdiction.

**1152**

argument that the delay should estop TWA from raising subject matter jurisdiction. The cases plaintiffs cited in support of their estoppel theory either did not involve subject matter jurisdiction, *Alger v. Hayes*, 452 F.2d 841 (8th Cir. 1971), or involved a situation in which the defendant pleaded lack of jurisdiction in its answer, then filed a stipulation admitting jurisdiction, and then two years later, after the statute of limitations had run on the plaintiff's claim, attempted to raise the same jurisdiction issue it initially pleaded. *DiFrischia v. New York Central Railroad Co.*, 279 F.2d 141 (3rd Cir. 1960).[17] None of these cases, therefore, supports an estoppel argument in the present case.

Accordingly, for the reasons stated herein, we vacate the October 15, 1976 order and remand to the district court for further proceedings consistent with this opinion. The parties shall bear their respective costs.

---

**17.** This case has been limited in its application to its unusual facts. *See, e. g., Joyce v. United States*, 474 F.2d 215, 218 n.1 (3d Cir. 1973).