Evelyn Elisabeth **KIRKHUFF**, Appellee,

v.

Robert P. **NIMMO**, Administrator, Veterans Affairs, Appellant.

No. 81–1770.

United States Court of Appeals, District of Columbia Circuit.

Argued April 29, 1982.

Decided July 20, 1982.

---

Mark H. Gallant, Atty., Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellant. Kenneth M. Raisler, Asst. U. S. Atty., Washington, D. C., entered an appearance for appellant.

Robert M. Morgan, Washington, D. C., for appellee.

Before WILKEY and WALD, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

The Administrator of Veterans' Affairs (Administrator) appeals from a judgment by the District Court declaring invalid as *ultra vires* a Veterans' Administration regulation denying medical benefits for pregnancy and childbirth to financially needy veterans. This appeal raises serious questions about the power of the federal courts to review decisions of the Administrator. Because we find that, even assuming we have such power, the regulation survives appellee's challenges, we reverse and remand.

## I

■ Appellee Evelyn Kirkhuff is an honorably discharged veteran of the Navy. In 1975, after her discharge and during the course of her pregnancy, she inquired of the Veterans' Administration (V.A.) as to her entitlement to free hospital care, she being unable to pay for her own care. The V.A. informed her that the regulations provided for financial benefits only in the event of a pregnancy or parturition complicated by a pathological condition. She subsequently made formal application for hospital coverage, but when a medical examination con-

ducted at the expense of the V.A. revealed no pathology, her application was denied. After the normal birth of her child, Kirkhuff appealed the denial of her application to the Board of Veterans Appeals, and simultaneously petitioned the Administrator to change the regulation and reimburse her for her medical expenses, which totaled $1,017.82. On January 26, 1978, the Administrator denied her petition, stating "that the ability to procreate and the existence of an uncomplicated pregnancy are not in themselves" compensable within the framework of the relevant statute. J.A. at 87. The Board likewise denied her application, finding itself "bound in its decisions by the regulations of the Veterans' Administration." J.A. at 79. Having thus exhausted her administrative remedies, Kirkhuff filed an action against the Administrator in the District Court, contending that the regulation exceeded his statutory authority and the bounds of the Constitution, and seeking declaratory and injunctive relief.[1] The parties filed cross-motions for summary judgment. On May 8, 1981, the District Court granted Kirkhuff's motion and remanded the case to the V.A. for processing, holding that both of her claims were subject to judicial review, and that the regulation indeed exceeded the scope of the Administrator's statutory authority.[2] It is from this decision that the Administrator of Veterans' Affairs appeals.

## II

■ Before reaching the merits of the instant case, we are confronted with a serious argument that the federal courts lack the power to review decisions of the admin-

istrator. 38 U.S.C. § 211(a) (1976) provides that

> the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans ... shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

Appellant claims that this provision constitutes a barrier to judicial review of his decision not to amend the rule and, as well, of the substance of the rule itself. Appellee, on the other hand, would have us apply the barrier only to review of adjudicative determinations of the Administrator.

Jurisdictional limitations like the one expressed in § 211(a) are to be interpreted narrowly, in the light of a "basic presumption of judicial review" which is to govern absent " 'clear and convincing evidence' " of congressional intent to the contrary. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), *quoting Rusk v. Cort*, 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 795, 7 L.Ed.2d 809 (1962). *See de Magno v. United States*, 636 F.2d 714, 721 (D.C.Cir.1980).

There is clear evidence in the plain language of the provision that Congress intended to exempt some decisions of the Administrator from judicial scrutiny. In addition, Congress, reacting to a line of cases in this court construing it narrowly,[3] amended § 211(a) in 1970 to broaden the reach of the provision. H.R.Rep.No.1166,

1. The basis for appellee's challenge is not entirely clear. Appellant characterizes it as a petition for review of the Administrator's refusal to withdraw the regulation. Appellee, on the other hand, insists that her challenge is against the regulation itself. If so, appellee indicates no statutory basis for challenging a rule that has been in existence for decades. Consequently, we must regard appellee's action as a challenge to the V.A.'s refusal to withdraw the regulation. Although in this type of action our standard of review is looser than it would be were we reviewing the rule itself, *see WWHT, Inc. v. FCC*, 656 F.2d 807, 817–18 (D.C.Cir.

1981); *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1045–47 (D.C.Cir.1979), the rule would withstand judicial review under either standard. *See* part III *infra*.

2. Owing to its finding of *ultra vires*, the District Court did not confront the plaintiff-appellee's constitutional claims.

3. *E.g., Tracy v. Gleason*, 379 F.2d 469, 473 (D.C.Cir.1967); *Thompson v. Gleason*, 317 F.2d 901, 907 (D.C.Cir.1962) (both confining § 211(a) to review of initial applications for veterans' benefits).

91st Cong., 2d Sess. 8–11 (1970), U.S.Code Cong. & Admin.News 1970, p. 3723. The precise reach of § 211(a), however, remains unclear. Consequently, while allowing that some decisions of the Administrator must indeed stand untouched by the judiciary, courts have recognized various exceptions to the statutory limitation on review.

In *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), the Supreme Court held that § 211(a) did permit some judicial review within the context of the veterans' benefits statutes. In that case, a conscientious objector, who had been denied educational benefits under a statute providing such benefits to veterans, challenged the statute itself on first and fifth amendment grounds. The Supreme Court held that such challenges were not barred by § 211(a) because they involved questions of law arising "under the Constitution," rather than "under the statute." *Id.* at 367, 94 S.Ct. at 1166, quoting the opinion of the district court in that case, 352 F.Supp. 848, 853 (D.Mass.1973). Indeed, the Court implied that such a construction was necessary to render the provision constitutional. 415 U.S. at 366–67, 94 S.Ct. at 1165–1166.

In explaining the policy justifications for allowing review, the Court indicated that Congress had limited judicial review for two principal purposes:

> (1) to insure that veterans' benefits claims will not burden the courts and the Veterans' Administration with expensive and time-consuming litigation, and
>
> (2) to insure that the technical and complex determinations and applications of Veterans' Administration policy connected with veterans' benefits decisions will be adequately and uniformly made.

*Id.* at 370, 94 S.Ct. at 1167 (footnotes omitted). The Court determined that such purposes were not disserved by an exercise of jurisdiction in the type of case before it, a constitutional challenge to the statute itself rather than a decision made "in the interpretation or application of a particular provision of the statute to a particular set of facts." *Id.* at 367, 94 S.Ct. at 1166.

Following *Johnson,* courts of appeals have expanded even further the reach of judicial review of V.A. actions. In several cases courts have held permissible constitutional review of V.A. regulations.[4] In addition, some courts have agreed to consider nonconstitutional challenges to V.A. actions. For example, in *Wayne State University v. Cleland,* 590 F.2d 627 (6th Cir. 1978), the Sixth Circuit considered a claim that the Administrator lacked statutory authority to promulgate a regulation defining full-time study for purposes of determining veterans' educational benefits. The court held that the rationale of *Johnson* indicated that regulations were indeed reviewable by the courts for consistency with the statute, since such review would neither "involve the federal courts in the day to day operations of the V.A." nor "spawn suits requesting federal courts to second guess the Administrator on the merits of particular claims for benefits or the termination of such benefits." *Id.* at 631–32 (footnote omitted). Such suits, instead, "seek a determination whether regulations have been promulgated pursuant to a congressional grant of authority." *Id.* at 632.

In similar cases, several other courts of appeals have followed the reasoning of *Wayne State* in reviewing challenges to V.A. regulations. *See, e.g., Evergreen State College v. Cleland,* 621 F.2d 1002 (9th Cir. 1980); *University of Maryland v. Cleland,* 621 F.2d 98 (4th Cir. 1980); *Merged Area X (Education) v. Cleland,* 604 F.2d 1075 (8th Cir. 1979). Still others have attempted to limit *Johnson* to its facts. *See, e.g., Anderson v. Veterans Administration,* 559 F.2d 935 (5th Cir. 1977); *Mulvaney v. Stetson,* 470 F.Supp. 725 (N.D.Ill.E.D.1979).

While this court has said that the holding in *Johnson* "extends beyond its specific facts and that its analysis is appropriate in determining whether a statute precludes judicial review of constitutional challenges to

---

**4.** *See, e.g., Evergreen State College v. Cleland,* 621 F.2d 1002, 1008 (9th Cir. 1980); *Devine v. Cleland,* 616 F.2d 1080, 1083–85 (9th Cir. 1980).

*See also Moore v. Johnson,* 582 F.2d 1228, 1232 (9th Cir. 1978).

agency procedures," *Carter v. Cleland*, 643 F.2d 1, 5 (D.C.Cir.1980), it has never broadened that holding beyond the constitutional arena. In *Carter*, appellants challenged a V.A. interpretive guideline, on the basis of which they had been denied death benefits. The relevant benefit legislation provided death benefits only to surviving spouses who had cohabited with a deceased veteran spouse continuously prior to the latter's death. The challenged guideline indicated that "[t]he birth of a child to the claimant as the result of relations with a person other than the veteran [would] be accepted as proof of lack of continuous cohabitation .…" Veterans Administration Department of Veterans Benefits Manual M21–1 § 8.11(c)(4) (1975), quoted in *Carter*, 643 F.2d at 3. This court held that in the absence of constitutional challenge, neither a claim that the evidence did not support the findings of the Board of Veterans Appeals, nor a claim that "the statute requires case-by-case determinations of fault and does not permit the creation of categories of conduct that operate automatically to exclude spouses from death benefits," *id.* at 7, is reviewable by the courts in the face of § 211(a). The court, while pretermitting the issue of the validity of the *Wayne State* exception, declined to extend any such exception to nonbinding interpretive guidelines such as the one then before the court. *See also Ralpho v. Bell*, 569 F.2d 607, 620 (D.C.Cir.1977) (construing a provision similar to § 211 and indicating that a reading of the statute to preclude constitutional review of agency procedures would raise doubts of constitutionality like those considered and averted in *Johnson*).

The extent to which Veterans' Administration decisions are exempt from review raises serious questions. Nevertheless, because we hold that the judgment of the District Court must be reversed, even assuming that we may review the decision of the Administrator in this case, we need not reach this difficult question.

**5.** The V.A. has interpreted the statutory language to provide hospitalization to needy veter-

## III

In 1924, Congress first extended medical coverage to needy veterans suffering from disabilities unrelated to service in the line of duty in the armed forces. Pub.L.No. 68–242, § 202(9), (10), ch. 320, 43 Stat. 607, 620 (1924). Prior to that time, benefits extended only to victims of service-connected disabilities. The new statute, the World War Veterans' Act, 1924, defined covered conditions as "wound[s]," "injury," and "disease." *Id.* *See generally* S.Rep.No.397, 68th Cong., 1st Sess. 3 (1924).

In 1925, the V.A. first denied medical coverage to a pregnant veteran, pursuant to the opinion of its medical director that

it was the consensus of opinion of the Medical Service that pregnancy and parturition, uncomplicated, were physiological functions and therefore could not be considered as disabilities for which hospitalization could be granted .…

J.A. at 132. The General Counsel of the V.A. conceded that this determination was "obviously not a matter within the jurisdiction of [his] office but within that of [the medical] service." *Id.* The V.A. subsequently adopted a formal regulation providing to that effect:

[w]omen veterans will not be entitled to hospital care for pregnancy and parturition unless it is complicated by a pathological condition.

38 C.F.R. § 17.48(e) (1981). In the event of such a pathological condition, the veteran may apply for benefits even after the fact, providing that someone contacts the V.A. on her behalf within 72 hours of a hospital admission. 38 C.F.R. § 17.50d(a) (1981). Failure to meet this deadline only reduces the time during which a veteran is eligible for compensation. *Id.* at (b).

■ The relevant statute now authorizes the Administrator to provide compensation for "a non-service-connected disability," 38 U.S.C. § 610(a)(1)(B) (1976), which it defines as "a disease, injury, or other physical or mental defect." 38 U.S.C. § 601(1) (1976).[5] Appellee contends, and the District

ans suffering from "a disability, disease, or

Court held, that the V.A. regulation denying compensation for normal parturition does not comport with the language of this statute. She rests this argument on two distinct bases. First, she claims that normal parturition is a disability because it requires hospitalization. Second, she contends, following the District Court, that "the history of legislation providing hospital care to veterans evinces a congressional intent to enact increasingly comprehensive benefits and to recognize the distinct nature of women's medical needs" and that this intent is "irreconcilable with the VA regulation." Appellee's Br. at 39.

Kirkhuff argues with reason that a common-sense definition of "disability" might include normal pregnancy and parturition. Indeed, both pregnancy and, *a fortiori*, parturition, may disable the mother from performing certain activities. It may also be that modern medical thought contemplates hospital-based childbirth. We are not confronted, however, with the bare statutory use of the word "disability." Rather, Congress has taken pains to indicate that "disability" within the meaning of the statute only encompasses three types of conditions: injury, disease, and defect. We thus need not determine what "disability" may mean in everyday parlance or in the abstract. We must instead consider what Congress meant by these three words.

Our standard of review in such cases is governed by the recent opinion of the Supreme Court in *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). The Court indicated that if the meaning of a statute is clear neither from the plain language of the statute nor by necessary implication from it, when an agency has the primary responsibility for administering and enforcing a statute, and has sole and considerable dis-

cretionary power to interpret and apply the act, "deference [must] presumptively be afforded" to its construction of the statute in question. *Id.* at 45. This deference is underscored if the agency's "position on the question . . . is clear," if it "consistently has adhered to its construction" of the provision in question, and if it has several times rejected the proposed alternate construction. *Id.* In such circumstances, the task for the courts, in determining whether the agency's construction is contrary to law, is

> not to interpret the statute as it thought best but rather the narrower inquiry into whether the [agency's] construction was "sufficiently reasonable" to be accepted by a reviewing court. . . . To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

*Id.* at 46 (citations omitted).

This standard is applicable to review of the regulation challenged in the instant case. The Veterans' Administration has the primary responsibility for interpreting and applying the various veterans' benefits statutes; this is a task for which it has considerable expertise.[6] It has, since the passage of the relevant legislation, adhered to an interpretation barring benefits for normal pregnancy and childbirth, even in the face of several challenges to this determination.

█ In addition, deference is due to an agency's construction of a statute when Congress becomes aware of, and fails to correct, that construction. *Cf. Thompson v. Clifford*, 408 F.2d 154, 166 (D.C.Cir.1968) (ratification of or acquiescence in an agency's construction of a statute by the legislature enhances the deference due that construction). The Administrator's interpreta-

defect which, being susceptible to cure or decided improvement, indicates need for hospital care . . . . " 38 C.F.R. § 17.47(d)(1) (1981).

**6.** *See, e.g.,* 38 U.S.C. § 210(c)(1) (1976), which provides that

[t]he Administrator has authority to make all rules and regulations which are necessary or appropriate to carry out the laws administered by the Veterans' Administration and are consistent therewith . . . .

*See also* 38 U.S.C. § 621 (1976), especially *id.* at (a).

tion of the benefits legislation as excluding compensation for normal parturition was early brought to Congress's attention. When, in 1926, the House Committee on World War Veterans Legislation held a hearing on the provision of medical care for army nurses, the following colloquy occurred between the Chairman of the committee and a representative of a disabled veterans' group:

> CHAIRMAN: In this connection, I am very clear in my belief that an injustice is being done to some of these women who served just as much as anybody else did in the A.E.F., although they did not have a military status. An injustice is particularly being done to some who were actually under fire and to some who were actually disabled . . . .
>
> . . . I believe, however, . . . we have the yeomanettes who were taken in, and . . . the legal division of the bureau held, as I recall it, that some of these yeomanettes may use these hospitals for maternity wards.
>
> MR. MILLER: No, sir; the Veterans' Bureau has held that childbirth is a physiological phenomenon and not a disability.

Hearings on H.R. 4474 Before the House Committee on World War Veterans' Legislation, 69th Cong., 1st Sess. 371 (1926) (Part I). Furthermore, the interpretation has been cited in published opinions of the Comptroller General and the V.A. General Counsel,[7] and has been republished every year since 1938 in either the Federal Register or the Code of Federal Regulations.[8] Reply Br. at 8. And where within the same statute Congress wished to provide maternity coverage for certain wives and widows of veterans who suffered from, or had perished of, service-connected disabilities, it did so expressly. 38 U.S.C. § 613 (1976), incorporating 10 U.S.C. § 1077(a)(8) (1976). That this difference in specificity was not

coincidental is indicated by the fact that the provisions of care for the latter group of women are generally much broader than for veterans suffering non-service-connected disabilities. See pages 551–52 infra. Under these circumstances, however plausible may be alternate constructions of this legislation, we must uphold the agency's interpretation if we find it, in the language of the Supreme Court, "sufficiently reasonable."

Appellee urges that the Administrator's construction of the statute is unreasonable because it conflicts with the intent of Congress as expressed in the legislative history of the Act, and in subsequent Congressional action. In support of this conclusion, she points to several exchanges that occurred prior to passage of the original statute authorizing medical care for non-service-connected disabilities. One such exchange occurred between the representative of the American Legion and Senator Reed of Pennsylvania:

> MR. MILLER: It is hoped that these benefactions will be extended to the veterans of all wars who are requiring hospitalization, without regard to the origin or character of their disease or injury, and we feel that the hospitals will not be congested or overcrowded, because men do not seek hospitalization in Government hospitals unless they have to. . . .
>
> SENATOR REED: I think the committee agrees with you fully, but it is just a question whether the hospital's capacity will admit it. We would like to make the change you suggest, and I think we will if the figures indicate that it is possible.

Veterans Bureau Codification Act: Hearings on S. 2257 Before the Subcomm. (unnamed) of the Senate Finance Comm., 68th Cong., 1st Sess. 7 (1924).

Senator Reed also discussed the matter at the hearings with General Hines, Director of the Veterans' Bureau.

---

7. 9 Comp.Gen. 244 (1929); 74 Op.Sol. 119 (1944).

8. Cf. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. § 307.").

GENERAL HINES: The first recommendation made by the bureau is with reference to the authorization of general hospitalization; to authorize the hospitalization in the discretion of the director of all honorably discharged veterans of any war who are in need of hospitalization, wherever facilities are available and sufficient therefor.

SENATOR REED: That, of course, was the recommendation of President Coolidge in his message.

GENERAL HINES: Yes; in his message. The committee has included on page 33 of the bill, section 10, commencing on line 19, a provision which in effect is the same as that of the bureau, and I feel that it could be made broader, less subject to serious interpretation, if the language was changed somewhat, and I have suggested that section 10 should read as follows:

> The United States Veterans' Bureau is hereby authorized, in the discretion of the director, to furnish hospitalization in Government hospitals, and necessary traveling expenses, to veterans of any war who have not been dishonorably discharged from the service, and who, in the judgment of the director, are in need of hospitalization, without regard to the nature or origin of their disabilities.

*Id.* at 87.

The provision as ultimately enacted sets forth two separate criteria for compensation: hospital care must be necessary, 38 U.S.C. § 610(a) (1976), *and* the condition for which it is sought must constitute a disability, *id.* at § 610(a)(1)(B), defined as "a disease, injury, or other physical or mental defect." *Id.* at § 601(1). The exchange between Mr. Miller and Senator Reed speaks of hospitalization for "disease" or "injury," rather than "any condition" or even "any disability." It also indicates that the cost of providing such extensive coverage and the capacity of the V.A. hospitals

to admit of such extension were uppermost in the minds of members of Congress.[9] We cannot, therefore, conclude from these exchanges that the statute indicates plainly or by necessary implication that veterans are to receive hospital care for normal childbirth.

Appellee also argues that subsequent actions of Congress indicate its intent to provide maternity care to female veterans. Over a half century of Congressional deliberations, it is argued, evince an intent "that hospital care be liberally afforded to all veterans and that special provisions be made for the medical needs of women veterans." Appellee's Br. at 49. Kirkhuff supports this proposition by reference to several different sections of the statute under which she claims entitlement to benefits. First, in 1973 Congress extended free hospital care to all needy veterans suffering from all disabilities, rather than compensating only wartime veterans or veterans serving after 1955. Pub.L.No.93–82, § 102, 87 Stat. 179, 180 (1973), codified at 38 U.S.C. § 610 (1976). Second, at the same time Congress provided compensation for outpatient care when such care could "obviate the need of [ ] hospital admission ...." Pub.L.No.93–82, § 103(a), 87 Stat. 179, 180–81 (1973), codified at 38 U.S.C. § 612(f) (1976). Third, Congress provided maternity and infant care to certain dependents of disabled or deceased veterans. 10 U.S.C. § 1077(a)(8) (1976).

Congress has attempted over the years to maximize utilization of V.A. hospital facilities. *See, e.g.,* S.Rep.No.397, 68th Cong., 1st Sess. 8 (1924) (letter of Frank T. Hines, Director, Veterans' Bureau); 65 Cong.Rec. 10172 (1924) (remarks of Rep. Browning); S.Rep.No.1206, 94th Cong., 2d Sess. 71 (1976), U.S.Code Cong. & Admin.News, 1976, p. 6355. An attempt to optimize use of existing facilities does not, however, indicate a desire to create the new facilities that would be necessary to extend care to

---

**9.** Many V.A. hospitals lack facilities for providing care to female patients. Hospital care in such instances is provided by "contracting-out," 38 U.S.C. § 601(4)(C)(iv) (1976), which is less costly than equipping V.A. hospitals themselves. Reply Br. at 25 n.*. V.A. hospitals are not now equipped, as they were not in 1924, with maternity wards. Appellant's Br. at 25.

pregnant veterans. *See* note 9 *supra.* And Congress itself has indicated that its primary mission over the years has been

> the provision of first-class medical care to service-connected veterans. Its secondary mission has been to provide care for non-service-connected veterans, but only to the extent that facilities are available so as to bring about a patient population size which would promote efficient utilization of resources.

S.Rep.No. 1206, 94th Cong., 2d Sess. 71 (1976), U.S.Code Cong. & Admin.News 1976, p. 6363. Appellee can draw little support from the provision of maternity care to survivors and spouses of disabled veterans. Congress has stated that with regard to this group

> [t]he Nation has long recognized that the widow and children of a veteran who dies of service-connected disease or injury or of a veteran who has a service-connected total disability are in a special category and deserving of substantial compensation and assistance in return for the sacrifice the family has made.

H.R.Rep.No.368, 93d Cong., 1st Sess. 7 (1973).

■ As we indicated above, although the interpretation suggested by appellee may be one of a number of reasonable interpretations of the legislation, and while that interpretation might even be the one the courts would have favored in the first instance, when the appropriate construction is not plain from the face of the statute or necessarily implied by it, so long as the agency's interpretation is "sufficiently reasonable," we must uphold it. In the light of the legislative history, the wide-ranging responsibility and discretion of the Veterans' Administration on matters dealing with benefits for veterans, and the long-standing, consistent, and widely publicized nature of the V.A.'s interpretation, we hold that it satisfies this test.

## IV

■ Appellee also raises constitutional challenges to the Veterans' Administra-

tion's policy of denying benefits for normal pregnancy and parturition. Again, we may assume for purposes of analysis that we have jurisdiction, and, in fact, this type of challenge falls more closely within the exception created by *Johnson* than does a challenge based on *ultra vires.*

Appellee raises two constitutional challenges. First, she claims that the regulation denies her due process by erecting irrebuttable presumptions that veterans going through a normal childbirth are not disabled, and that it is possible to ascertain prior to delivery that parturition will be normal. The alleged violation of due process inheres in the "factually unjustified" nature of such presumptions. Appellee's Br. at 31.

Kirkhuff rightly notes that the Supreme Court has discountenanced the use of irrebuttable presumptions that are not justified by the underlying facts. *See, e.g., Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 643–48, 94 S.Ct. 791, 797–800, 39 L.Ed.2d 52 (1974); *Stanley v. Illinois,* 405 U.S. 645, 654–58, 92 S.Ct. 1208, 1214–1216, 31 L.Ed.2d 551 (1972). The regulation at issue in this case does not, however, fall within the strictures of these holdings because it does not constitute an irrebuttable presumption. The regulation does not presume either that women will not need hospitalization for normal parturition, or that it is possible to ascertain normalcy of delivery prior to the procedure. It does not and need not presume the former because that is not the exclusive statutory standard for compensation. The statement that women will not receive compensation for uncomplicated childbirth is more in the nature of an administrative interpretation of the statute than an irrebuttable presumption and is, as we have indicated in part III, reasonable. And by allowing payment of compensation retroactively if a delivery turns out to be complicated, the V.A. avoids presuming irrebuttably that one may determine in advance that parturition will be uncomplicated.[10]

10. We note as well that the Supreme Court

appears to have contracted the applicability of

Second, Kirkhuff claims that the regulation discriminates in violation of her right to equal protection, and that it should be strictly scrutinized both because the basis of the discrimination is gender and because it impinges upon the fundamental right of procreation.

The challenged regulation does not discriminate on the basis of gender, but rather distinguishes between types of conditions that are genuinely different. The Supreme Court held in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), that a state system of disability insurance may exclude benefits for normal pregnancies without violating the equal protection clause, absent a showing that the exclusion was a pretext for gender discrimination. Appellee's argument that *Geduldig* is inapposite because the regulation challenged in that case was, on its face, gender neutral ignores the obvious fact that any regulation dealing with pregnant persons deals only with individuals of one gender, regardless of the facial characteristics of the law. Appellee also argues that *Geduldig* can be distinguished because of the strong state policies in that case supporting the regulation: that to hold otherwise would have necessitated an increase in assessments on state employees or would have rendered the insurance program no longer self-supporting, and that under that program, assessments were proportional to wages.

These distinctions do not persuasively distinguish the regulation challenged in the instant case.[11] As in *Geduldig*, exclusion of coverage for pregnancy has a strong basis in that financial and hospital resources for veterans are limited. Congress might well have decided that pregnancy coverage, which could not be provided within existing V.A. hospitals, would place too heavy a burden on the system. This consideration,

part of the Supreme Court's analysis in *Geduldig*, was underlined in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), in which the Court again pointed to cost considerations, as well as to the fact that it considered pregnancy to be "significantly different from the typical covered disease or disability," *id.* at 136, 97 S.Ct. at 408, in upholding, in the face of a challenge based on Title VII, a private disability plan excluding coverage for pregnancy-related treatment. Thus, the V.A. does not discriminate on the basis of gender when it denies coverage for nonpathological pregnancy and childbirth.

Kirkhuff further claims that the regulation must be scrutinized strictly because it impinges on the "fundamental" right of procreation, set forth by the Supreme Court in *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). *Skinner* involved mandatory sterilization of habitual criminal offenders, a direct and permanent burden on the ability to procreate. Such a direct burden must be distinguished, for purposes of analysis, from both an indirect burden and the deprivation of a benefit. *See Califano v. Aznavorian*, 439 U.S. 170, 174–78, 99 S.Ct. 471, 473–475, 58 L.Ed.2d 435 (1978). The plaintiff in *Aznavorian* challenged a statute discontinuing certain social security benefits for recipients spending time outside of the United States as a deprivation of her constitutional right to international travel. The Court upheld the statute because to the extent that it impaired that right, the burden was only incidental. *Id.* at 177.

Likewise, in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Court held that the right to terminate a pregnancy at an early stage, which the court indicated was fundamental to the

irrebuttable presumption analysis when the statute in question grants government largesse. *See, e.g., Weinberger v. Salfi*, 422 U.S. 749, 771–72, 95 S.Ct. 2457, 2469–2470, 45 L.Ed.2d 522 (1975).

11. Neither does the fact that the regulation challenged in *Geduldig* was promulgated by a state. While principles of federalism do dictate

that federal courts respect attributes of state sovereignty, the separation of powers doctrine dictates that we afford respect to determinations of coordinate branches of the federal government. Although the V.A. does not constitute such a coordinate branch, its regulation expresses, as we have held in part III of this opinion, the policy and intent of the Congress.

right to procreate, was not offended by the government's failure to fund early abortions. In so holding, the Court stated:

[t]he financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency.... We are thus not persuaded that the Hyde Amendment impinges on the constitutionally protected freedom of choice ....

Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.

*Id.* at 316–18, 100 S.Ct. at 2688–2689 (footnote omitted). For this reason, the Court, in reviewing the statute, utilized the rational basis standard.

The Government must establish, then, only that the challenged regulation rationally furthers some government end. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–1162, 25 L.Ed.2d 491 (1970).[12] Cost considerations attendant to the provision of natal and prenatal care, the difference between pregnancy and other "disabilities," and the limited nature of V.A. medical facilities suffice to provide a rational link between the regulation and the V.A.'s primary purpose to provide medical care to veterans with service-connected disabilities, and its secondary purpose to provide care to other needy veterans, consistent with efficient usage of its resources.

Because we find that the regulation challenged in the instant case survives statutory and constitutional muster, we reverse the determination of the District Court to the contrary.

*It is so ordered.*

12. A particularly loose form of review may be appropriate when the challenged statute (or regulation) concerns a "noncontractual benefit under a social welfare program." *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).