**Laura SCHMITZ, Plaintiff,**

v.

**ING SECURITIES, FUTURES & OPTIONS, INC.,[1] Defendant.**

No. 96 C 5754.

United States District Court,
N.D. Illinois,
Eastern Division.

July 9, 1998.

---

1. It is uncertain whether "Inc." is or is not part of defendant's name—its earliest filings in this action included that designation, but its most recent submissions do not. This opinion will employ the name that was set out in the original Complaint (which fixes the caption of the case) and Answer.

Arnold H. Landis, Chicago, IL, for Plaintiff.

David B. Ritter and Elizabeth S. McKelvey of Altheimer & Gray, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Laura Schmitz ("Schmitz") has sued her ex-employer ING Securities, Futures & Options, Inc. ("ING") under Title VII, 42 U.S.C. §§ 2000e to 2000e–17, asserting that she had been the victim of (1) sexual harassment and (2) retaliatory firing. After ING then moved for summary judgment dismissing Schmitz' claims under Fed.R.Civ.P. ("Rule") 56, the parties have complied with this District Court's General Rule ("GR") 12(M) and 12(N)—provisions adopted to facilitate the identification of the existence or nonexistence of genuine issues of material fact. It is clear from those two submissions and from the litigants' supporting memoranda that Schmitz must fail as a matter of law, so that there is no need to await the final filing of ING's reply memorandum, due to be submitted on July 21. Instead, for the reasons stated in this memorandum opinion and order, ING's motion is granted and this action is dismissed.

### Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party" (in this instance Schmitz), although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)).

### Schmitz' Sexual Harassment Claim

Within the past two weeks the Supreme Court has issued two June 26 opinions containing its universally-awaited definitive pronouncements on the liability of employers for sexual harassment by supervisors, *Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In part *Burlington,* —— U.S. at ——, 118 S.Ct. 2257 serves to limit the significance of the dichotomy between "quid pro quo" and "hostile environment" sexual harassment that had been built up in the lower federal courts' jurisprudence, based on the Supreme Court's earlier mention of those terms in *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In that respect it is undisputed that what Schmitz claims is not quid pro quo harassment: As discussed hereafter, the complained-of comments and criticisms of Schmitz by ING's

then Chief Financial Officer William Pauly ("Pauly") were the exact opposite of threats (or even hints) that Schmitz' job hinged on her willingness "to submit to a supervisor's sexual demands" (*Burlington,* —— U.S. at ——, 118 S.Ct. 2257).

*Burlington, id.* also teaches that "[f]or any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive" and that "unfulfilled threats" based on such a refusal to submit "should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." And although neither *Burlington* nor *Faragher* of course limited the "hostile work environment" concept to the kind of threats that if carried out could have fitted within the "quid pro quo" notion, both decisions made it clear that the principles voiced in *Meritor* continue to set the guideposts for *all* claims of sexual harassment (*Faragher,* —— U.S. at ——–——, 118 S.Ct. 2275; *Burlington*).

In that regard *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399 relied on the EEOC Guidelines (29 C.F.R. § 1604.11(a)) for the definition of "sexual harassment" actionable under Title VII:

> As an "administrative interpretation of the Act by the enforcing agency," *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), these Guidelines, " 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,' " *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–142, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

That definition comprises "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." And most importantly for this case, neither *Burlington* nor *Faragher* nor any of

the earlier Supreme Court decisions on which they rely—not *Meritor,* not *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), not *Oncale v. Sundowner Offshore Servs., Inc.,* —— U.S. ——, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)—involved the type of conduct that is ascribed to Pauly (which it will be seen was the very antithesis of quid pro quo harassment), nor did any of those decisions even suggest that conduct of the type that Pauly will be seen to have engaged in arguably comes under the rubric of sexual harassment as marked out by those cases.

■ With that general preview of what is to come, it is time to turn to the specifics of Schmitz' claim—a claim that Schmitz has characterized, and that ING and this Court have accordingly treated, as one of alleged sexual harassment. There is really no quarrel about the fact that while Schmitz was working as ING's receptionist—with her primary duties comprising answering the telephone, greeting guests and sorting mail, with some lesser responsibilities for typing and other office matters as time permitted—she was frequently badgered by Pauly about what he believed to be her wearing of inappropriately suggestive clothing—skirts that were too short (always ending 5 to 6 inches above her knee), skirts and blouses that were too tight, blouses that were low-cut and showed her cleavage, and generally clothes that were too sheer and revealing [2]—as well as what he perceived as her unseemly provocative behavior.

For the most part Schmitz' testimony on that score (which will be credited for purposes of the present Rule 56 motion) was to this effect (GR 12(M) ¶ 44):

> For example, Ms. Schmitz claims that Mr. Pauly asked her whether she thought her skirt was too short for the office and her leggings were appropriate workplace attire. Ms. Schmitz also alleges that Mr. Pauly said that her dress left nothing to the imagination; that he was a "hot blooded male" and if he could be aroused by her

---

2. Among the red herrings sought to be thrown across the evidentiary trail by Schmitz is her statement that there had been "nothing in Ms. Schmitz' one-year performance review about her dress" (GR 12(N) ¶ 13). That and several other assertions by Schmitz are obviously aimed at the

notion that ING's stated reasons for Schmitz' termination are a pretext. But a pretext for what? Surely not to mask sexual harassment, for there is no real dispute about what Pauly said and did—only about its legal consequences.

inappropriate attire, imagine what she was doing to the rest of the office (i.e., distracting them); and that he would not let his wife leave the house if she dressed like Ms. Schmitz.

Even more particularly, here are some paragraphs of ING's GR 12(M) statement that (except as limited by this opinion's corresponding footnotes) are to be viewed as uncontested by Schmitz in factual terms, at least in the way in which GR 12(M) and 12(N) interact:

6. Both male and female co-workers complained and commented that Ms. Schmitz's attire was inappropriate for the workplace. Mr. Pauly recalls that "half the people on [the] floor at one point or another probably had commented to [him] relative to the inappropriateness of [Ms. Schmitz's] dress."[3]

10. On one occasion, Ms. Schmitz, wearing a sheer skirt, lifted up her sweater and asked Ms. Melinauskas [a fellow employee] how she looked from behind. Ms. Melinauskas could see straight through the skirt, and told Ms. Schmitz that her thong bikini underwear and her "rear end" showed through the skirt. Ms. Schmitz put her slip back on.[4]

23. Another of Ms. Schmitz's duties involved greeting ING's guests. Ms. Schmitz greeted guests in an unprofessional manner, making inappropriate comments to male vendors in Ms. Melinauskas' presence that embarrassed and shocked both the vendors and Ms. Melinauskas.[5]

25. Ms. Schmitz had a tendency to slouch at the reception desk. Because she frequently wore low-cut attire, her poor posture had the effect of exposing her cleavage. One vendor visiting Ms. Melinauskas actually asked Ms. Schmitz to sit up, saying that if he didn't tell her, someone else would. Ms. Melinauskas, who was present at the time, was embarrassed by the incident.[6]

38. Ms. Schmitz also brought inappropriate materials to work. Ms. Schmitz showed vacation photographs of herself wearing a thong bikini bathing suit to her male and female co-workers. One photograph showed Ms. Schmitz from behind, leaning over a balcony, with her "rear end" exposed. Ms. Schmitz also showed Ms. Melinauskas a photograph of Ms. Schmitz's then-boyfriend "laying naked on a bed or sofa with a hat over his privates."[7]

39. Ms. Schmitz showed Mr. Pauly and another male co-worker a picture of a naked woman in a Playboy Magazine, telling them that she had been asked to audition or to pose for the photograph.[8]

Although this Court has frequently called lawyers' attention to the inappropriateness of their filing an answer that says a document referred to in a complaint "speaks for itself" (rather than counsel's conforming to the directive of Rule 8(b) that calls for a response to every allegation), the details that have just been recited provide one instance in which that colloquialism seems singularly apt.

Both Pauly and Schmitz confirm that he was unable to register his point of view with her because they were on totally different wavelengths—from her perspective she felt that she was being sexually harassed, while from his perspective both her dress and her conduct were unacceptable.[9] According to

3. [Footnote by this Court] Schmitz objects to that statement as hearsay, but it is not—it is admissible to establish the fact that others had so commented to Pauly.

4. [Footnote by this Court] Here Schmitz complains that the statement is "irrelevant" and denies that the incident occurred. But the statement's relevance could not be more plain, and the real issue for purposes of the statement's admissibility could fairly be viewed as whether ING's people believed that the occurrence had taken place. To avoid any resolution of credibility issues, however, GR 12(M) ¶ 10 will not be taken into account for purposes of this decision.

5. [Footnote by this Court] Again Schmitz mistakenly challenges this as irrelevant, but she does not dispute it factually.

6. [Footnote by this Court] Here Schmitz has admitted the statement by her GR 12(N) ¶ 25 response, which simply claims (again incorrectly) that it is irrelevant.

7. This is another statement effectively admitted by Schmitz' GR 12(N) response, though again she voices an erroneous relevance objection.

8. This too has been effectively admitted, again with an untenable objection to its relevance.

9. Pauly had also criticized some other employees for assertedly inappropriate attire. Thus he also

Schmitz' deposition testimony as to the most egregious instance of what she labeled as sexual harassment, Pauly once came past the reception desk where she was sitting, threw out his chest, threw out his behind, got on his toes and strutted around the office saying in essence, "Schmitz, how come you always parade through the office like this?" Fellow employee Anna Melinauskas ("Melinauskas"), who was present, testified without contradiction that this incident took just 15 seconds and that Pauly took just three or four steps imitating Schmitz.[10]

It is obvious not only from that incident but from the entire previously-set-out pattern of conduct of both Schmitz and Pauly (even viewed from Schmitz' perspective) that the situation was the exact opposite of the too-frequently encountered scenario that properly carries the label of "sexual harassment": the attempt by a workplace superior to "hit on" a lower-level employee through suggestive remarks or worse. Instead the just-described single incident, like Pauly's numerous statements to Schmitz, reflected his criticism of Schmitz for what he viewed as *her* flaunting of inappropriately sexy dress and sexy demeanor.[11]

Schmitz Mem. 1 complains that Pauly "sexually harassed Laura Schmitz by creating a hostile work environment." If Schmitz did in fact see the workplace environment as "hostile," that notion stemmed from her own misperception that *she* was entitled to make the rules for workplace behavior without reference to her employer's wishes—but what has been described here, when Pauly persisted in his efforts to correct Schmitz' conduct after she consistently refused to respond to his urging that she wear more modest attire and conduct herself in a less exhibitionist manner, does not constitute a "hostile work environment" in the sense recognized by the caselaw. Indeed, Schmitz Mem. 3 characterizes her own claim by referring (as did *Meritor*, 477 U.S. at 65, 106 S.Ct. 2399) to

EEOC's 29 C.F.R. § 1604.11(a) definition of "sexual harassment":

> Sexual harassment is defined as unwelcome sexual advances, request for sexual favors and other verbal or physical conduct of a sexual nature.

Although Schmitz surely found Pauly's criticisms to be "unwelcome," there is no question that they were exactly the opposite of "sexual advances, request for sexual favors and other verbal or physical conduct of a sexual nature."

In this Court's view the Title VII prohibition against sexual harassment as a type of sex discrimination cannot fairly extend to the situation presented here, in which a company executive seeks to have a female employee cease what he considers to be improperly suggestive dress and demeanor, only to encounter a defiant response that the problem was his and not hers. And to that end it is not necessary (as Schmitz' response implies) that the employer must already have a formal dress code in place. To put that last issue into a reductio ad absurdum posture, if the type of employee conduct criticized by an executive were (say) actual sexual activity in the workplace instead of perceived sexually provocative clothing and demeanor, it clearly would not matter that there was no preexisting formal policy prohibiting such activity.

Nor will it do for Schmitz to counter by saying that Pauly was wrong—that her clothes were *not* too tight and too sheer, her skirts were *not* too short, and so on. Because the matters of which Pauly complained do not fit the definition of sexual harassment embraced in the recent definitive pronouncements in *Burlington* and *Faragher* or the like statements in prior decisions, this case brings into play instead the general principle that, under the at-will employment principles that apply except for statutory entitlements

---

reprimanded Sandi Deckter because he considered her clothes to be too tight and too sheer, and her skirts to be too short. Unlike Schmitz, Deckter changed her conduct, for example by having one of her short skirts lengthened by a tailor.

**10.** Though Melinauskas testified that Pauly did not stick out his chest, for present purposes this

Court will credit Schmitz' version in that respect. It presents a nonmaterial difference, of course.

**11.** Schmitz herself concedes that Pauly never directed any suggestive remark to her that indicated any sexual interest in her, nor did he ever ask her for a date or touch her in any way.

such as Title VII (*Ryherd v. General Cable Co.*, 124 Ill.2d 418, 427, 125 Ill.Dec. 273, 530 N.E.2d 431, 435 (1988)):

> The common law rule that an employee at will can be discharged at any time, for a good reason, a bad reason, or no reason at all, remains in force, modified only by the prohibition of discharges in contravention of a clearly mandated public policy.

Hence Schmitz' sexual harassment claim falls for the most fundamental of reasons—that the conduct of which she complains simply did not constitute sexual harassment in the sense prohibited by Title VII (or indeed in any other common sense use of that concept). It may be worth adding, however, that ING has a written sexual harassment policy that is (1) given to all employees during their orientation, (2) posted in prominent places in the office and (3) requires employees who believe they are being sexually harassed to report such conduct either to their supervisor or to ING's Human Resources personnel or both (GR 12(M) ¶ 47). Though Schmitz did complain to Pauly, to fellow employee Melinauskas and to Human Resources Manager Teri Riley that she was upset because Pauly did not approve of her clothing and because she believed she was being unfairly singled out for wearing inappropriate clothing, she never indicated to any of them that she believed she was being *sexually* harassed.

Enough is enough. It is unnecessary to dwell further on the clear basis for dismissal of Schmitz' first claim.

### Retaliatory Discharge

█ *Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 518 (7th Cir.1996)(emphasis in original) sets out the essential ingredients of a retaliation claim such as that advanced by Schmitz here:

> To establish a prima facie case of retaliation under the *McDonnell Douglas* framework, Pasqua must establish by a preponderance of evidence that: (1) he participated in *protected activity* or opposed an *activity made unlawful* under Title VII; (2) he subsequently suffered adverse employment action; and (3) there was a causal connection between the adverse employment action and his participation or opposition.

*Pasqua, id.* (emphasis again in original) goes on to emphasize that the employee's "*subjective* beliefs are irrelevant" and that the employee "was required to establish that [s]he had a *reasonable* belief that the [complained-of conduct] amounted to harassment based on sex." In the present context, of course, Schmitz' burden is the lesser one of demonstrating the existence of a genuine issue of material fact on that score.

Even at that lower hurdle Schmitz stumbles and falls, taking herself out of the summary judgment race. What has gone before demonstrates with equal force the untenability of Schmitz' Title VII-related retaliation claim. Whatever her subjective perception may be, there is no reasonable predicate for attaching the sexual harassment label to Pauly's conduct of which she now complains. And that dooms her claim under *Pasqua* and like cases.

Schmitz Mem. 8–9 attempts to salvage her claim based on (1) the proximity in time between her having complained to Riley about Pauly's complaints about her and the time of her termination just a few weeks later and (2) the fact that various other matters demonstrating her unsatisfactory performance as an employee had not been reflected in her one-year review a few months earlier or in any written reprimand or warning.[12] Again any potential for reasonable inferences adverse to ING is undercut by Schmitz' failure at the threshold level as defined by *Pasqua* and similar cases.

In sum, Schmitz' retaliation claim fares no better than her underlying sexual harassment claim. It too must be dismissed.

### Conclusion

Schmitz was of course entitled to view Pauly's attitudes as excessively Puritanical.

12. Although this need not be explored further in light of the fundamental insufficiency of Schmitz' retaliation claim, she offers either token or no opposition to the validity of a substantial number of those other criticisms. And in that respect the situation again comes down to a difference between the employer's evaluation of an employee's performance and the employee's self-evaluation, a dispute that is no-contest under the almost innumerable opinions exemplified by *Ryherd.*

And she was and is of course equally entitled to seek out other employment with an employer having a more permissive outlook on tight skirts, excessively short skirts, see-through skirts exposing thong underwear, other sheer clothing, low-cut bodices and the like.[13] But what Schmitz is not entitled to do is to invoke Title VII liability as the vehicle for obtaining a financial victory over her employer, thus improperly rewarding her unacceptable point of view as to such things as who should have general control over the workplace conditions of dress and demeanor—the employer or the intransigent employee.

There is no genuine issue of material fact as to either of Schmitz' claims, and ING is entitled to a judgment as a matter of law. This action is dismissed.

---

**13.** Any such employer would of course be at risk if it were to memorialize or voice such an outlook publicly. It does not require much imagination to foresee the charges of sexism that would be leveled against it—charges that would almost surely find their way into the courts.